RECEIVED

2013 MAR - 1

RICHARD W.
CLERK, U.S. DIST
NORTHERN DIST

FILED BY FAX

1    LIONEL Z. GLANCY (#134180)
     MICHAEL GOLDBERG (#188669)
2    ROBERT V. PRONGAY (#270796)
     CASEY E. SADLER (#274241)
3    GLANCY BINKOW & GOLDBERG LLP
4    1925 Century Park East, Suite 2100
     Los Angeles, California 90067
5    Telephone: (310) 201-9150
     Facsimile:  (310) 201-9160
6    E-mail: info@glancylaw.com

7
     JOSEPH P. GUGLIELMO
8    DONALD A. BROGGI
     JOSEPH D. COHEN (#155601)
9    SCOTT+SCOTT LLP
10   The Chrysler Building
     405 Lexington Avenue 40th Floor
11   New York, NY 10174
     Telephone: (212) 223-6444
12   Facsimile:  (212) 223-6334

13
     Attorneys for Plaintiff
14   [Additional counsel on signature page]

15                   UNITED STATES DISTRICT COURT
16                  NORTHERN DISTRICT OF CALIFORNIA

LHK

17   POLICE AND FIRE RETIREMENT          Case No.: 13    0945
     SYSTEM OF THE CITY OF DETROIT,
18   Individually and On Behalf of All Others
19   Similarly Situated,
                                         CLASS ACTION COMPLAINT FOR
20              Plaintiff,               VIOLATIONS OF THE FEDERAL
                                         SECURITIES LAWS
21              v.
                                                                      HRL
22   ROSEMARY A. CRANE, PATRICK D.
     SPANGLER, PATRICK S. JONES,
23   PETER C. BRANDT, PHILIPPE O.        JURY TRIAL DEMANDED
     CHAMBON, DARREN W. COHEN,
24   THOMAS L. HARRISON, GILBERT H.
     KLIMAN, JOHN E. VORIS, MARK A.
25   WAN, JACOB J. WINEBAUM and
     EPOCRATES, INC.,
26
27              Defendants.
28

Plaintiff Police and Fire Retirement System of the City of Detroit ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which included without limitation a review and analysis of: (a) regulatory filings made by Epocrates, Inc. ("Epocrates" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by Epocrates; and (c) other publicly available information concerning Epocrates.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of: (1) persons or entities who purchased or otherwise acquired the securities of Epocrates pursuant and/or traceable to the Company's Registration Statement and Prospectus (collectively, the "Registration Statement" or "Offering Materials") issued in connection with the Company's February 2, 2011, initial public offering (the "IPO" or the "Offering") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"); and (2) purchasers of Epocrates' securities between February 2, 2011 and August 9, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").   Epocrates provides subscriptions for mobile drug reference tools and electronic health records to healthcare professionals, as well as interactive services to the healthcare industry.

2.      On August 9, 2011, the Company reported its 2011 fiscal second quarter financial results and lowered its net sales guidance for the 2011 fiscal year from the range of $122 million to $125 million to the range of $115 million to $120 million.   According to the Company, the reason for this revised guidance was that its revenue growth was being negatively impacted by expanding regulatory queues, causing delays in the launch of DocAlert® messages and the lengthening of the time between contract signing and revenue recognition.

3.      On this news, shares of Epocrates declined $6.80 per share, nearly 40%, to close on August 10, 2011, at $9.89 per share, on heavy trading volume.

4.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts, about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company's pharmaceutical clients were awaiting guidance relating to use of advertising on the Internet and through social media from the United States Food and Drug Administration ("FDA"); (2) that, as a result, the Company's pharmaceutical clients were increasingly delaying their marketing activities as they awaited guidance from the FDA; (3) the FDA's delays in issuing guidance relating to the Internet and social media was causing expanding regulatory queues for Epocrates; (4) that the expanding regulatory queues were negatively impacting the Company's sales and revenue growth; and (5) that, as a result of the foregoing, the Defendants' positive statements about the Company's business, operations and prospects lacked a reasonable basis and/or were materially false and misleading at all relevant times.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts

charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Defendant is located within this Judicial District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

10. Plaintiff Police and Fire Retirement System of the City of Detroit, as set forth in the accompanying certification, incorporated by reference herein, purchased Epocrates common stock pursuant, or traceable, to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11. Defendant Rosemary A. Crane ("Crane") was, at all relevant times, President, Chief Executive Officer ("CEO") and a director of the Company. Defendant Crane signed or authorized the signing of the Registration Statement.

12. Defendant Patrick D. Spangler ("Spangler") was, at all relevant times, Chief Financial Officer ("CFO") of the Company. Defendant Spangler signed or authorized the signing of the Registration Statement.

13. Defendant Patrick S. Jones ("Jones") was, at all relevant times, Chairman of the Board and a director of the Company. Defendant Jones signed or authorized the signing of the Registration Statement.

14. Defendant Peter C. Brandt ("Brandt") was, at all relevant times, a director of the Company. Defendant Brandt signed or authorized the signing of the Registration Statement.

15. Defendant Philippe O. Chambon ("Chambon") was, at all relevant times, a director of the Company. Defendant Chambon signed or authorized the signing of the Registration Statement.

16.     Defendant Darren W. Cohen ("Cohen") was, at all relevant times, a director of the Company.  Defendant Cohen signed or authorized the signing of the Registration Statement.

17.     Defendant Thomas L. Harrison ("Harrison") was, at all relevant times, a director of the Company.   Defendant Harrison signed or authorized the signing of the Registration Statement.

18.     Defendant Gilbert H. Kliman ("Kliman") was, at all relevant times, a director of the Company.   Defendant Kliman signed or authorized the signing of the Registration Statement.

19.     Defendant John E. Voris ("Voris") was, at all relevant times, a director of the Company.  Defendant Voris signed or authorized the signing of the Registration Statement.

20.     Defendant Mark A. Wan ("Wan") was, at all relevant times, a director of the Company.  Defendant Wan signed or authorized the signing of the Registration Statement.

21.     Defendant Jacob J. Winebaum ("Winebaum") was, at all relevant times, a director of the Company.   Defendant Winebaum signed or authorized the signing of the Registration Statement.

22.     Defendants Crane, Spangler, Jones, Brandt, Chambon, Cohen, Harrison, Kliman, Voris, Wan and Winebaum are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Epocrates' reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.   Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   The Individual

Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

23.     Defendant Epocrates is a Delaware corporation with its principal executive offices located at 1100 Park Place, Suite 300, San Mateo, California 94403.

24.     Defendant Epocrates and the Individual Defendants who signed the Registration Statement are liable for the false and misleading statements incorporated into the Registration Statement.

## SUBSTANTIVE ALLEGATIONS

### Epocrates and Its Revenue Recognition Policy

25.     Epocrates provides subscriptions for mobile drug reference tools and electronic health records to healthcare professionals, as well as interactive services to the healthcare industry. Most commonly used on mobile devices at the point of care, the Company's products help healthcare professionals make more informed prescribing decisions, enhance patient safety and improve practice productivity. At the time of the Company's IPO, the Company claimed its user network consisted of over one million healthcare professionals, including over 300,000, or over 45% of, U.S. physicians.

26.     According to the Company, at all relevant times, Epocrates primarily generated revenues from providing interactive services, including the Company's "DocAlert" clinical messages, as well as the Company's "Virtual Representative Services." As the Company described:

> Through our interactive services, we provide the healthcare industry, primarily pharmaceutical companies, access to our user network to deliver targeted information and conduct market research in a cost-effective manner. Our services include DocAlert® clinical messages that deliver product news and alerts to healthcare professionals. Our Virtual Representative Services, including drug detailing, sampling, patient literature delivery and the ability to contact drug manufacturers, are designed to supplement and replicate the activities of pharmaceutical sales representatives.

27.     The Company's DocAlert messages, which are short clinical alerts delivered to Epocrates users when they connect with the Company's databases to receive updated content are both sponsored and non-sponsored.  At the time of the IPO, the Company claimed that approximately 26% of its DocAlert messages delivered to U.S. physicians had been sponsored by its clients.

28.     At the time of the IPO, Epocrates recognized revenue for the Company's sponsored DocAlert messages when the messages were published and available to Epocrates' users.  According to the Offering Materials, the Company typically contracted with its clients to publish an agreed upon number of sponsored DocAlert messages over the contract period, which was typically one year, with each sponsored message available to Epocrates' users for four weeks.  Under the Company's stated revenue recognition policy, Epocrates recognized revenue from its sponsored DocAlert messages ratably over the delivery period of each message (*i.e.*, four weeks).  As a result, the Company's ability to recognize revenue on its DocAlert messages was tied to when the sponsored messages were published to Epocrates' users and would be delayed in the near term in the event that Epocrates' clients postponed publication of sponsored messages.

### Epocrates' IPO

29.     On or around February 1, 2011, Epocrates filed the final Registration Statement with the SEC on Form S-1/A (the "Registration Statement").[1]  In the IPO, the Company issued 3,574,285 shares of common stock at $16.00 per share, raising approximately $53.2 million net of underwriters' discounts and commissions.  Additionally, in the IPO, the underwriters

---

[1]   The term "Registration Statement" or "Registration Statements" as used herein includes, *inter alia*, the Form S-1 Registration Statement, filed with the SEC on July 16, 2010 (the "Form S-1"), and the following Amendments to the Form S-1 filed on Forms S-1/A: Amendment No. 1, filed September 27, 2010 ("Amendment No. 1"), Amendment No. 2, filed October 27, 2010 ("Amendment No. 2"), Amendment No. 3, filed November 17, 2010 ("Amendment No. 3"), Amendment No. 4, filed November 22, 2010 ("Amendment No. 4"), Amendment No. 5, filed January 10, 2011 ("Amendment No. 5"), Amendment No. 6, filed January 20, 2011 ("Amendment No. 6"), Amendment No. 7, filed January 31, 2011 ("Amendment No. 7"), and Amendment No. 8, filed February 1, 2011 ("Amendment No. 8").

exercised their over-allotment option on an additional 804,000 shares, raising approximately $11.9 million more for the Company, net of underwriters' discounts and commissions.

## Materially False and Misleading
## Statements Issued During the Class Period

30.   The Class Period begins on February 2, 2011.  On this day, in connection with the IPO, the Company filed the Prospectus for the IPO.

31.   The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.

32.   Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

33.   The Registration Statement represented the regulatory climate for the Company's pharmaceutical advertising and promotion business, in relevant part, as follows:

> *Regulation of drug and medical device advertising and promotion.* We provide services involving promotion of prescription and over-the-counter drugs and medical devices. Any increase in regulation of these areas by the FDA, the Federal Trade Commission, or FTC, or other governmental bodies at the federal, state or local level, could make it more difficult for us to contract for certain of our interactive services. Physician groups and others have criticized the FDA's current policies and have called for restrictions on advertising of prescription drugs and for increased FDA enforcement. In response, the FDA has conducted hearings and sought public comment regarding its regulation of information concerning drugs on the Internet and the relationships between pharmaceutical companies and those disseminating information on drugs. We cannot predict what actions the FDA or industry participants may take in response to these criticisms. It is also possible that new laws would be enacted that impose restrictions on such marketing and advertising. Our interactive services revenues could be materially reduced by additional restrictions on the marketing or advertising of prescription drugs and medical devices, whether imposed by law or regulation or by policies adopted by industry members.

> If the FDA, the FTC or another governmental body finds that any information available on our website or distributed by us violates FDA, FTC or other laws or regulations, they may take regulatory or judicial action against us or the

advertiser or sponsor of that information: State attorneys general may also take similar action based on their state's consumer protection statutes or other new or existing laws.

*       *       *

### Regulation of drug and medical device advertising and promotion

We provide services involving promotion of prescription and over-the-counter drugs and medical devices. The FDA regulates the form, content and dissemination of labeling, advertising and promotional materials prepared by, or for, pharmaceutical or medical device companies, including direct-to-consumer prescription drug and medical device advertising. The FTC regulates over-the-counter, or OTC, drug advertising and, in some cases, medical device advertising, as well as general product or service advertising. Generally, based on FDA requirements, regulated companies must limit advertising and promotional materials to discussions of FDA-approved uses and claims. Information that promotes the use of pharmaceutical products or medical devices that we disseminate on behalf of our clients is subject to the full array of the FDA and FTC requirements and enforcement actions. Information in our services that is not disseminated on behalf of clients is not subject to such regulatory oversight. However, products or services that discuss use of an FDA-regulated product or that the regulators believe may lack editorial independence from the influence of sponsoring pharmaceutical or medical device companies may become a focus of regulatory scrutiny.

The federal Food, Drug, and Cosmetic Act, or FD&C Act, requires that prescription drugs, including biological products, be approved for a specific medical indication by the FDA prior to marketing. It is a violation of the FD&C Act and of FDA regulations to market, advertise or otherwise commercialize such products prior to approval.  The FDA does allow for preapproval exchange of scientific information, provided it is nonpromotional in nature and does not draw conclusions regarding the ultimate safety or efficacy of the unapproved drug.  Upon approval, the FDA's regulatory authority extends to the labeling and advertising of prescription drugs offered in interstate commerce. Such products may only be promoted and advertised for approved indications. In addition, the labeling and advertising can be neither false nor misleading, and must present all material information, including risk information, in a balanced manner. Labeling and advertising that violate these legal standards are subject to FDA enforcement action. In the last few years, there have been several prominent enforcement actions, settled for hundreds of millions of dollars each, against pharmaceutical companies in connection with their alleged off-label promotion of their products.

The FDA regulates the safety, efficacy and labeling of OTC drugs under the FD&C Act, either through specific product approvals or through regulations

that define approved claims for specific categories of such products. The FTC regulates the advertising of OTC drugs under the section of the FTC Act that prohibits unfair or deceptive trade practices. Together, the FDA and FTC regulatory framework requires that OTC drugs be formulated and labeled in accordance with FDA approvals or regulations and promoted in a manner that is truthful, adequately substantiated and consistent with the labeled uses. OTC drugs that do not meet these requirements are subject to FDA or FTC enforcement action depending on the nature of the violation. In addition, state attorneys general can also bring enforcement actions for alleged unfair or deceptive advertising.

Any increase in FDA regulation of the Internet or other media for advertisements of prescription drugs could make it more difficult for us to obtain advertising and sponsorship revenue. In November 2009, the FDA held hearings and solicited comments concerning its regulation of the promotion of pharmaceuticals and other medical products using the Internet and social media tools, indicating its concern about activities in these forums and its intention to consider additional regulations in this area. There is a reasonable possibility that Congress, the FDA or the FTC may alter their present policies on the advertising of prescription drugs or medical devices in a material way. We cannot predict what effect any such changes would have on our business.

34. On March 29, 2011, the Company issued a press release entitled, "Epocrates Reports 2010 Fourth Quarter and Full-Year Financial Results and Provides 2011 Outlook." Therein, the Company, in relevant part, stated:

Epocrates, Inc. (Nasdaq:EPOC), a leading provider of mobile drug reference tools to healthcare professionals and interactive services to the healthcare industry, today reported financial results for its fiscal fourth quarter and full-year of 2010 and its financial outlook for 2011. Epocrates' net sales totaled $30.3 million in the fourth quarter of 2010 compared to $27.4 million in the same quarter of the prior year, an increase of 11%. For the year ended December 31, 2010, Epocrates' net sales increased 11% to $104.0 million compared to $93.7 million for the year ended December 31, 2009.

*       *       *

As of December 31, 2010, Epocrates had total backlog of $86.5 million, consisting of deferred revenue of $55.0 million, along with $31.5 million of contractual backlog. Bookings were $37.0 million in the fourth quarter of 2010, a 22% increase compared to the fourth quarter of 2009, led by a 43% increase in bookings from pharmaceutical company clients.

*       *       *

Outlook for Full-Year 2011

Epocrates expects full-year 2011 net sales to be in the range of $122 million to $125 million, representing growth of 17% to 20% over full-year 2010. Epocrates expects 2011 adjusted EBITDA of 16% to 17% of sales, or $19.5 million to $21.5 million. This would represent an increase in adjusted EBITDA of 15% to 27% over the adjusted EBITDA reported in 2010. In addition, full-year 2011 net income is expected to be in the range of $3.0 million to $4.0 million, and net income per diluted share is expected to be between $0.12 and $0.15, based on approximately 26.0 million shares outstanding.

35.    On March 31, 2011, Epocrates filed its Annual Report on Form 10-K with the SEC for the 2010 fiscal year.  The Company's Form 10-K was signed by Defendants Crane, Spangler, Jones, Brandt, Chambon, Voris, Wan and Winebaum, and reaffirmed the Company's statements announced on March 29, 2011.

36.    On May 10, 2011, the Company issued a press release entitled, "Epocrates Reports 2011 First Quarter Financial Results."  Therein, the Company, in relevant part, stated:

Epocrates, Inc. (Nasdaq:EPOC), a leading provider of mobile drug reference tools to healthcare professionals and interactive services to the healthcare industry, today reported financial results for its fiscal first quarter of 2011. Epocrates' net sales totaled $29.2 million in the first quarter of 2011 compared to $24.3 million in the same quarter of the prior year, an increase of approximately 20%.

Rose Crane, president and chief executive officer of Epocrates, Inc., commented, "With our first quarter results, we delivered a solid start to 2011 and continued to strengthen our leadership position at the point of care.  Our overall net sales growth was driven by a strong performance across both our subscription and interactive services businesses, which grew approximately 8% and 24%, respectively, versus the prior year quarter. Notably, sales in our core pharmaceutical business, which include DocAlert® messages and virtual representative services, increased by over 40% during the first quarter of 2011 compared to the same quarter of the prior year. These results reflect the growth in bookings that we saw in 2010 and the positive momentum we have generated from the investments we made to expand our product pipeline."

*        *        *

Outlook for Full-Year 2011

Epocrates continues to expect full-year 2011 net sales to be in the range of $122 million to $125 million, representing growth of 17% to 20% over full-

year 2010. Epocrates also continues to expect 2011 adjusted EBITDA of 16% to 17% of sales, or $19.5 million to $21.5 million. This would represent an increase in adjusted EBITDA of 15% to 27% over the adjusted EBITDA reported in 2010. In addition, full-year 2011 net income is expected to be in the range of $3.0 million to $4.0 million, and net income per diluted share is expected to be between $0.12 and $0.15, based on approximately 26.0 million shares outstanding.

37.     On May 12, 2011, Epocrates filed its Quarterly Report on Form 10-Q with the SEC for the 2011 fiscal first quarter. The Company's Form 10-Q was signed by Defendants Crane and Spangler, and reaffirmed the Company's statements announced on May 10, 2011.

38.     The statements contained in ¶¶33-37, were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's pharmaceutical clients were awaiting guidance relating to use of advertising on the Internet and through social media from the FDA; (2) that, as a result, the Company's pharmaceutical clients were increasingly delaying their marketing activities as they awaited guidance from the FDA; (3) the FDA's delays in issuing guidance relating to the Internet and social media was causing expanding regulatory queues for Epocrates; (4) the expanding regulatory queues were negatively impacting the Company's sales and revenue growth; and (5) as a result of the foregoing, the Defendants' positive statements about the Company's business, operations and prospects lacked a reasonable basis and/or were materially false and misleading at all relevant times.

### Disclosures at the End of the Class Period

39.     On August 9, 2011, the Company issued a press release entitled, "Epocrates Reports 2011 Second Quarter Financial Results and Updated 2011 Guidance." Therein, the Company, in relevant part, stated:

Epocrates, Inc. (Nasdaq:EPOC), a leading provider of mobile drug reference tools to healthcare professionals and interactive services to the healthcare industry, today reported financial results for its fiscal second quarter of 2011 and provided updated financial guidance for 2011. Epocrates' net sales totaled $27.9 million in the second quarter of 2011 compared to $25.3 million in the same quarter of the prior year, an increase of 10.2%.

"Epocrates continues to be recognized as a trusted leader in point-of-care solutions for healthcare professionals, as evidenced by our growing network of over 1.3 million users, including 328,000 U.S. physicians," stated Rose Crane, president and chief executive officer. "We are focused on strengthening our leadership position in delivering solutions to help improve patient care and practice efficiencies with the launch of the Epocrates® EHR for small practice physicians and new product offerings for pharma clients.  All of these represent exciting long-term growth opportunities that complement our core business, leverage our broad physician network and position Epocrates for continued long-term success."

Crane added, "With respect to our pharma revenue, which grew 18 percent in the second quarter of 2011 over the second quarter of 2010, *there are two factors which are impacting the timing of revenue growth. Due to expanding regulatory queues, we are experiencing delays in the launch of DocAlert® messages. For our newer products, the time between contract signing and revenue recognition is taking longer than expected due to the size and complexity of these launches. These factors impacted our second quarter revenue and are expected to continue to affect the timing of our net sales for the remainder of the year. Accordingly, we are proactively updating our guidance to reflect the shift in timing."*

Crane continued, "Our updated guidance also reflects our decision to focus the first phase of availability for our Epocrates EHR solution to a targeted group of early adopters in order to continue to enhance the product. While this is expected to impact our revenue in the second half of 2011, we believe this approach will result in a better user experience for the physician and long-term success of our EHR."

\*       \*       \*

Outlook for Full-Year 2011

Epocrates has updated its expected full-year 2011 net sales guidance to be in the range of $115 million to $120 million, representing growth of 11% to 15% over full-year 2010. Epocrates has also updated its 2011 adjusted EBITDA to be 11% to 14% of sales, or $13 million to $17 million. This would represent a decrease in adjusted EBITDA of 26% to 4% over the adjusted EBITDA reported in 2010. In addition, full-year 2011 net income has been updated to be in the range of $0.5 million to $3.0 million, and net income per diluted share has been updated to be between $0.01 and $0.10, based on approximately 26.0 million shares outstanding.

[Emphasis added.]

40.     On this news, shares of Epocrates declined $6.80 per share, nearly 40%, to close on August 10, 2011, at $9.89 per share, on heavy trading volume.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who: (1) purchased or otherwise acquired the securities of Epocrates pursuant and/or traceable to the Company's Registration Statement issued in connection with the Company's June 16, 2011 IPO seeking to pursue remedies under the Securities Act; and (2) purchasers of Epocrates' securities during the Class Period, seeking to pursue remedies under the Exchange Act.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Epocrates' securities were actively traded on the NASDAQ Stock Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Epocrates shares were traded publicly during the Class Period on the NASDAQ.  As of July 31, 2011, the Company had 23,530,255 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Epocrates or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Epocrates; and

(c)     To what extent the members of the Class have sustained damages and the proper measure thereof.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

47.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Epocrates' securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Epocrates' business, operations, and prospects as alleged herein.

## LOSS CAUSATION

48.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49.     During the Class Period, Plaintiff and the Class purchased Epocrates' securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Epocrates, his/her control over, and/or receipt and/or modification of Epocrates' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Epocrates, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

51.     The market for Epocrates' securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Epocrates' securities traded at artificially inflated prices during the Class Period.  On February 4, 2011, the Company's stock closed at a Class Period high of $26.51 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Epocrates' securities and market information relating to Epocrates, and have been damaged thereby.

52.     During the Class Period, the artificial inflation of Epocrates' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Epocrates' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Epocrates and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

53.     At all relevant times, the market for Epocrates' securities was an efficient market for the following reasons, among others:

(a)     Epocrates stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Epocrates filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Epocrates regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Epocrates was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Epocrates' securities promptly digested current information regarding Epocrates from all publicly available sources and reflected such information in Epocrates' stock price. Under these circumstances, all purchasers

of Epocrates' securities during the Class Period suffered similar injury through their purchase of Epocrates' securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

55.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Epocrates who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

56.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

57.     This Count is brought against all Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the all persons or entities who purchased or otherwise acquired the securities of Epocrates pursuant and/or traceable to the Company's Registration Statement issued in connection with the Company's February 2, 2011 IPO.

58.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

59.     Epocrates is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

60.     As issuer of the shares, Epocrates is strictly liable to Plaintiff and the Class for the misstatements and omissions.

61.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

62.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

63.     Plaintiff acquired Epocrates shares pursuant and/or traceable to the Registration Statement for the IPO.

64.     Plaintiff and the Class have sustained damages.  The value of Epocrates common stock has declined substantially subsequent to and due to Defendants' violations.

**SECOND CLAIM**
**Violation of Section 12(a)(2) of**
**The Securities Act Against All Defendants**

65.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

66.     This Claim is brought pursuant to § 12(a)(2) of the Securities Act against the Defendants.

67.     Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus.  Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the IPO.  The Registration

Statement contained a Prospectus, which was used to induce investors, such as Plaintiff and the other members of the Class, to purchase Epocrates common stock.

68.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to disclosed material facts.  The Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.  Epocrates, acting through its employees, agents, and others, solicited such purchases for its personal financial gain through the preparation and dissemination of the Prospectus.

69.     Epocrates, its employees and agents, and the Individual Defendants owed Plaintiff and members of the Class a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care by their employees and agents should have known of, the misstatements and omission contained in the IPO materials, including the Prospectus, as set forth above.

70.     Plaintiff and other members of the Class purchased or otherwise acquired Epocrates common stock pursuant to and/or traceable to the defective Prospectus.  Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contain in the Prospectus.

71.     By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Epocrates common stock purchased in the IPO have the right to rescind and recover the consideration paid for their Epocrates common stock and hereby elect to rescind and tender their Epocrates common stock to Defendants sued herein in return for the consideration paid for those securities with interest thereon.  Class members who have sold their Epocrates common stock are entitled to rescissory damages.

## THIRD CLAIM
### Violation of Section 15 of
### The Securities Act Against the Individual Defendants

72.     Plaintiff repeats and realleges each and every allegation contained above, except any allegation of fraud, recklessness or intentional misconduct.

73.     This count is based upon Section 15 of the Securities Act, and is asserted against the Individual Defendants on behalf of all persons or entities who purchased or otherwise acquired the securities of Epocrates pursuant and/or traceable to the Company's Registration Statement issued in connection with the Company's February 2, 2011 IPO.

74.     Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Epocrates within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Epocrates to engage in the acts described herein.

75.     Individual Defendants position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

76.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## FOURTH CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Epocrates' securities at artificially inflated prices.

In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

79.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Epocrates' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

80.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Epocrates' financial well-being and prospects, as specified herein.

81.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Epocrates' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Epocrates and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

82.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of

their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

83.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Epocrates' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' omission and/or misstatements regarding the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

84.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Epocrates' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Epocrates' securities during the Class Period at artificially high prices and were damaged thereby.

85.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Epocrates was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Epocrates securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

86.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### FIFTH CLAIM
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

88.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Epocrates within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various

statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

90.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

91.     As set forth above, Epocrates and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: March 1, 2013

**GLANCY BINKOW & GOLDBERG LLP**

By: _____
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

JOSEPH P. GUGLIELMO
DONALD A. BROGGI
JOSEPH D. COHEN
SCOTT+SCOTT LLP
The Chrysler Building
405 Lexington Avenue 40th Floor
New York, NY 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
jcohen@scott-scott.com

- and -

DAVID R. SCOTT
156 South Main Street, P.O. Box 192
Colchester, CT 06415
Telephone: (860) 537-5537
Facsimile: (860) 537-4432
drscott@scott-scott.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, David Cetlinski, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.     I am the Assistant Executive Director of the Police and Fire Retirement System of the City of Detroit (the "Police and Fire Retirement System").

2.     I have reviewed the Complaint in this matter and authorize Scott+Scott, Attorneys at Law, LLP to file a complaint and to file lead plaintiff papers in this matter.

3.     The Police and Fire Retirement System is willing to serve as a representative party on behalf of the purchasers of Epocrates, Inc. ("Epocrates") securities during the Class Period, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period, the Police and Fire Retirement System purchased the Epocrates securities that are the subject of the Complaint as set forth on the attached Schedule A.

5.     The Police and Fire Retirement System  did not engage in the foregoing transactions at the direction of counsel, or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.     During the three-year period preceding the date of my signing this Certification, The Police and Fire Retirement System has served or sought to serve as a representative party or lead plaintiff on behalf of a class in a private action arising under the Securities Act or the Exchange Act in the following cases:

*Norfolk County Retirement System v. Tempur-Pedic International, Inc.*, 5:12-cv-00195 (E.D. Ky.) (moved to be appointed as lead plaintiff and was appointed)

*Bristol County Retirement System v. Allscripts Healthcare Solutions, Inc.*, 1:12-cv-03297 (N.D. Ill.) (moved to be appointed as lead plaintiff but was not appointed)

*In re Netflix, Inc., Securities Litigation*, 3:12-cv-00225-SC (N.D. Cal.) (moved to be appointed as lead plaintiff but was not appointed)

*In re IndyMac Mortgage Backed Securities Litigation*, 1:10-cv-04429 (S.D.N.Y.) (moved to be appointed as lead plaintiff and was not appointed but was granted the right to intervene and is serving as an additional plaintiff)

7.     The Police and Fire Retirement System will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation

1

of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at _DETROIT,_
_Michigan_, (city, state)

POLICE AND FIRE RETIREMENT
SYSTEM OF THE CITY OF DETROIT

_3-1-13_
Date

David Cetlinski
Assistant Executive Director

2

## SCHEDULE A

POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT

Class Period Transactions in Epocrates, Inc.
(Class Period: 2/1/2011 through 8/9/2011)

| Trade Date | Action (Buy/Sell) | Quantity | Price Per Share |
|---|---|---|---|
| 2/1/2011 | Buy | 7023 | $16.00 |
| 3/9/2011 | Buy | 1070 | $23.94 |
| 3/10/2011 | Buy | 2635 | $23.87 |
| 3/10/2011 | Buy | 2250 | $23.83 |
| 3/11/2011 | Buy | 422 | $24.39 |
| 3/14/2011 | Buy | 3813 | $24.51 |
| 3/15/2011 | Buy | 5452 | $25.82 |
| 3/15/2011 | Buy | 933 | $25.93 |
| 3/15/2011 | Buy | 353 | $25.46 |
| 3/21/2011 | Buy | 1909 | $23.33 |
| 3/21/2011 | Buy | 81 | $23.54 |
| 3/23/2011 | Buy | 600 | $23.24 |
| 3/31/2011 | Buy | 4461 | $19.86 |
| 4/6/2011 | Buy | 1235 | $19.60 |
| 4/7/2011 | Buy | 1903 | $22.91 |
| 4/7/2011 | Buy | 1592 | $22.72 |
| 4/14/2011 | Buy | 4000 | $22.60 |
| 4/26/2011 | Sell | 1000 | $24.31 |
| 6/14/2011 | Buy | 1740 | $17.38 |
| 6/16/2011 | Buy | 1547 | $18.18 |
| 6/16/2011 | Buy | 153 | $18.09 |
| 6/20/2011 | Buy | 1300 | $18.09 |
| 6/22/2011 | Buy | 6640 | $18.34 |
| 6/23/2011 | Buy | 2700 | $19.01 |
| 6/24/2011 | Buy | 100 | $18.73 |
| 7/26/2011 | Sell | 2000 | $16.82 |
| 7/28/2011 | Buy | 2355 | $16.47 |