LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
JOSHUA L. CROWELL (#295411)
CASEY E. SADLER (#274241)
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

BETH A. KASWAN
DEBORAH CLARK-WEINTRAUB
DONALD A. BROGGI
AMANDA F. LAWRENCE
JOSEPH D. COHEN (#155601)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334

*Attorneys for Lead Plaintiff*
*[Additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and On Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>   v.<br><br>ROSEMARY A. CRANE, PATRICK D. SPANGLER, and EPOCRATES, INC.,<br><br>   Defendants. | Case No. 5:13-cv-00945-VC<br><br>Hon. Vince Chhabria<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.    SUMMARY OF CLAIMS .................................................................. 1

II.   JURISDICTION AND VENUE ........................................................ 4

III.  PARTIES ......................................................................................... 5

IV.   SUBSTANTIVE ALLEGATIONS .................................................. 7

    A.   Epocrates' Business ................................................................ 7

        1.   DocAlerts: Epocrates' Most Important Product ................. 8

        2.   The Regulatory Environment for DocAlerts ...................... 8

    B.   Defendants' Scheme to Prematurely Recognize Revenue and Conceal the Company's Inability to Timely Deliver Contracted DocAlerts ......................... 9

    C.   How the "Repapering" of DocAlert Contracts Wrongfully Inflated Revenues and Affected Analysts' Perception of the Company's Value ........................... 13

    D.   The Fraudulent Scheme Is Described By High-Ranking Former Managers and Other Knowledgeable Witnesses ................................................. 16

        1.   The Confidential Witnesses' Senior Positions on the Company's Finance and Sales Teams ........................................... 16

        2.   CWs Confirm Defendants' Knowledge, Prior to the IPO, of Expanding Regulatory Queues and the Company's Resulting Inability to Timely Deliver Contracted DocAlerts ...................................... 18

        3.   Defendants' Inability to Recognize Sufficient Revenue to Meet Market Expectations in 2Q 2011 ........................................... 20

V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND MISLEADING OMISSIONS DURING THE CLASS PERIOD ................................... 22

    A.   Materially False or Misleading Statements and Material Omissions in the Company's Registration Statement ........................................ 22

    B.   Materially False or Misleading Statements and Material Omissions During Defendants' Discussion of 2010 Results ............................... 25

    C.   Materially False or Misleading Statements and Material Omissions in the 1Q 2011 Form 10-Q and Other Public Disclosures of 1Q 2011 Results .............. 28

VI.   THE TRUTH EMERGES: CORRECTIVE DISCLOSURES AND POST-CLASS PERIOD EVENTS ...................................................................................... 34

      A.   Defendants' Disclosure of 2Q 2011 Results ..................................... 34

      B.   Relevant Events After the End of the Class Period .......................... 37

VII.  DEFENDANTS' PREMATURE RECOGNITION OF REVENUE AND REVENUE AND EARNINGS MANAGEMENT ............................................................ 38

      A.   Defendants' Scheme Violated Fundamental Requirements of the Securities Laws and U.S. GAAP ...................................................... 38

      B.   Defendants' Improper Recognition of DocAlerts Revenue .............. 39

      C.   Defendants Failed to Comply with Disclosure Obligations and Thus Violated GAAP ................................................................................. 40

VIII. ADDITIONAL SCIENTER ALLEGATIONS ................................................ 41

IX.   LOSS CAUSATION .......................................................................................... 43

X.    CLASS ACTION ALLEGATIONS ................................................................. 47

XI.   APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS OF RELIANCE.................................... 48

XII.  NO SAFE HARBOR .......................................................................................... 50

XIII. COUNTS............................................................................................................. 50

FIRST COUNT
      Violation of §10(b) of The Exchange Act and
      Rule 10b-5 Promulgated Thereunder Against All Defendants.................... 50

SECOND COUNT
      Violation of §20(a) of the Exchange Act
      Against the Individual Defendants .............................................................. 53

XIV.  PRAYER FOR RELIEF ................................................................................... 54

XV.   JURY TRIAL DEMANDED............................................................................. 55

Lead Plaintiff Police and Fire Retirement System of the City of Detroit ("Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, its counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Epocrates, Inc. ("Epocrates" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

## I.      SUMMARY OF CLAIMS

1.      This is a securities fraud class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired Epocrates securities between February 1, 2011, and August 9, 2011, inclusive (the "Class Period"), and who were damaged thereby.

2.      Epocrates developed mobile applications for smart phones and tablets which it used to disseminate pharmaceutical drug information to its extensive base of doctors and other healthcare professionals.  The largest source of Epocrates' revenue came from selling to pharmaceutical companies access to this healthcare user network for marketing purposes, including paid promotional messages, or "DocAlerts."

3.      This action alleges that, immediately following the Company's February 1, 2011 initial public offering ("IPO"), Defendants pursued a scheme to fraudulently inflate Epocrates' stock price by misleading investors about the Company's then on-going problems in its

"DocAlerts" business.  Particularly, the Complaint alleges that Defendants falsely represented that Epocrates was experiencing "strong, steady growth" in this business when, in fact, delays in obtaining regulatory approvals for DocAlerts had caused a "huge hole" in 1Q 2011 revenues.  In order to conceal the truth, Defendants directed a scheme to prematurely recognize revenue by secretly cancelling and then reissuing (or "repapering") customer contracts, and that when Epocrates' senior accounting staff protested these manipulations, Defendants demoted or fired them.  The Individual Defendants, provided they could perpetrate the scheme through August, 2011, stood to make massive amounts of money when the IPO's "lock-up" agreement for the sale of management's stock would expire.

4.     As set forth in this Third Amended Complaint, DocAlerts were languishing in pharmaceutical company's internal regulatory queues and thus unable to be delivered—or recognized as revenue.  Confidential Witnesses ("CWs") explain how it was actually known in early 2011 that these regulatory queues would prevent Epocrates from reaching its projected revenues for the first three months of 2011, 1Q 2011.  Nevertheless, in roadshows conducted to generate investor interest in the IPO, in the Company's registration statement for the IPO, in subsequent SEC reports, and in other public disclosures during the Class Period, Defendants continually touted the strength of the Company's DocAlerts and associated businesses while repeatedly failing to disclose the adverse impact that expanding regulatory queues were having on its revenues and earnings.

5.     As set forth below, these misstatements include *inter alia:*

- faulty risk disclosures concerning potential FDA reviews (as opposed to known internal regulatory reviews);

- statements regarding positive momentum and visibility into future revenue;

- statements as to the strong performance during 1Q 2011 especially in the DocAlerts business;

- responses to stated questions regarding regulatory queues; and

- statements regarding the Company's critical accounting policies, which were changed to conceal the lengthening regulatory queues and slowing DocAlerts revenues.

6.     At no time did Defendants reveal to the market that DocAlerts were, in fact, experiencing long queues thus impeding the Company's ability to recognize revenue for those DocAlert contracts and that the *only* way the Company was able to achieve its predicted earnings for 1Q 2011 was through the unsustainable repapering scheme.

7.     In addition to these misstatements, Defendants' disclosures providing or touting the Company's overall revenue were materially false because, as a result of the repapering scheme, such revenue numbers were artificially inflated in violation of GAAP in a number of ways:

- persuasive evidence of an arrangement did not exist;

- DocAlert revenue was not fixed or determinable; and

- contingent revenue features existed that precluded treating DocAlerts as separate units of accounting.

8.     Defendants never revealed to the market that, in addition to affecting the timing of revenues, the delays in the regulatory approvals for the delivery of DocAlerts translated into long-term revenue losses and reduced profitability for additional reasons including: (1) due to constraints on how many DocAlerts could be delivered to on-line users over a period of time, delayed DocAlert deliveries often translated into lost deliveries and lost revenue; (2) because of fixed costs, the DocAlert business was less profitable if DocAlerts could not be delivered on the original schedule; and (3) the generation of new DocAlert business suffered when Epocrates'

sales staff were directed to re-focus their efforts on convincing their pharmaceutical company clients to cancel past contracts and negotiate accommodations for the cancellations.

9.    Rather than reveal these realities, Defendants launched their repapering scheme which involved soliciting the Company's major pharmaceutical customers to cancel and renegotiate their DocAlert contracts, *i.e.*, to "repaper" their agreements.  Specifically, over the objections of several members of the senior accounting staff, who were later terminated or left the Company due to their discomfort with the manner in which revenue was being recognized, Defendants analyzed each contract to determine what businesses arrangements could be made to permit the Company to meet its projections for the quarter by cancelling the DocAlert contract and replacing it with a contract offering concessions to the customer to the detriment of the Company.

10.    However, this scheme could only go on so long as the Company ran out of contracts to "repaper" and, in August 2011, when Epocrates needed to report its Second Quarter 2011 ("2Q 2011") results, Defendants were no longer able to hide the Company's problems – in large part because revenues actually earned in that quarter had been pulled forward and recognized prematurely, so that a "hole" in 2Q 2011 revenues had been created.  Thus, when, on August 9, 2011, Defendants revealed the Company's true financial condition and the long-existing "regulatory queues" that had been interfering with its ability to timely deliver its pharmaceutical company products to its user network, Epocrates' stock price plummeted, causing losses to Plaintiff and the class.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Defendant Epocrates is located within this Judicial District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     PARTIES

15.     Lead Plaintiff Police and Fire Retirement System of the City of Detroit, as set forth in its certification (ECF No. 1), purchased Epocrates common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Epocrates is a Delaware corporation with its principal executive offices located at 1100 Park Place, Suite 300, San Mateo, California 94403.  During the Class Period, Epocrates, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.  The Company's acquisition by athenahealth, Inc. was announced on March 12, 2013.

17.     Defendant Rosemary A. Crane ("Crane") was, at all relevant times, President, Chief Executive Officer ("CEO"), and a director of the Company.  Her separation from the Company was announced on November 16, 2011.  Crane participated in the issuance of, signed, and/or certified as accurate the Company's: Form S-1/A filed with the SEC on February 1, 2011

(the "Registration Statement");[1] Form 8-K and attached press release filed with the SEC on March 29, 2011 (the "4Q 2010 Form 8-K"); Form 10-K filed with the SEC on March 31, 2011 (the "FY 2010 Form 10-K"); Form 8-K and attached press release filed with the SEC on May 10, 2011 (the "1Q 2011 Form 8-K"); and Form 10-Q filed with the SEC on May 12, 2011 (the "1Q 2011 Form 10-Q"), many of which, as alleged herein, contained material misrepresentations and omissions when issued.  In addition, throughout the Class Period, Crane made statements in the Company's press releases and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.  For all relevant times, Crane made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.  Crane directed the "repapering" scheme and stood to benefit (by about $2 million) from the exercise of vested stock options and stock sales had she been able to conceal the scheme beyond the time that the management lock-up agreement expired in mid-August 2011.

18.     Defendant Patrick D. Spangler ("Spangler") was, at all relevant times, Chief Financial Officer ("CFO") of the Company.  His separation from the Company was announced on August 7, 2012. Spangler participated in the issuance of, signed, and/or certified as accurate the Company's Registration Statement, 4Q 2010 Form 8-K, FY 2010 Form 10-K, 1Q 2011 Form 8-K, and 1Q 2011 Form 10-Q, which, as alleged herein, contained material misrepresentations and omissions when issued.  In addition, throughout the Class Period, Spangler made statements in the Company's press releases and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.  For

---

[1] "Registration Statement" as used herein includes the Form S-1 Registration Statement, filed with the SEC on July 16, 2010 and the following Amendments to the Form S-1 filed on Forms S-1/A: Amendment No. 1, filed September 27, 2010; Amendment No. 2, filed October 27, 2010; Amendment No. 3, filed November 17, 2010; Amendment No. 4, filed November 22, 2010; Amendment No. 5, filed January 10, 2011; Amendment No. 6, filed January 20, 2011; Amendment No. 7, filed January 31, 2011 ("Amendment No. 7"); and Amendment No. 8, filed February 1, 2011 ("Amendment No. 8").

all relevant times, Spangler made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.

19.     Hereinafter, Defendants Crane and Spangler will be collectively referred to as the "Individual Defendants."  Defendant Epocrates and the Individual Defendants will be collectively referred to as "Defendants."[2]

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Epocrates' Business

20.     Founded in 1998 and based in San Mateo, California, Epocrates provided mobile drug reference tools to healthcare professionals, as well as interactive marketing services to the pharmaceutical industry.  The Company served more than 80 pharmaceutical companies, including all of the 20 largest such companies in the world, helping to promote more than 350 separate brands of pharmaceutical products.

21.     The Company's applications for smartphones, tablets, and personal digital assistants gave physicians, nurses, and other healthcare professionals convenient and efficient access to the information they needed to deliver pharmaceutical treatments, such as dosing, drug interactions, pricing, and insurance coverage for thousands of branded, generic, and over-the-counter drugs.  Due to the rapid growth of smartphone adoption in the healthcare industry, at the time of the Company's IPO, its network of users had grown to approximately 1.2 million healthcare professionals, including approximately 300,000 physicians.

22.     The Company monetized this network primarily by selling access to its extensive user base to pharmaceutical companies and other firms for marketing purposes.  Epocrates derived its revenue from two business segments: (i) Interactive Services, and (ii) Subscriptions.  Throughout the Class Period, the Interactive Services segment accounted for more than 75% of

---

[2] Patrick S. Jones, Peter C. Brandt, Philippe O. Chambon, Darren W. Cohen, Thomas L. Harrison, Gilbert H. Kliman, John E. Voris, Mark A. Wan, and Jacob J. Winebaum, named as defendants in the initial complaint (ECF No. 1), were voluntarily dismissed from this action on October 8, 2013. *See* ECF No. 35.

the Company's total revenue.   Most Interactive Services revenue came from fees that pharmaceutical companies paid to sponsor promotional messages called DocAlerts, which were delivered to the Company's user base through its mobile applications.

### 1.    DocAlerts: Epocrates' Most Important Product

23.    DocAlerts were the Company's most important product and its single largest source of overall revenue.   J.P. Morgan Securities LLC ("J.P. Morgan") estimated that DocAlerts accounted for approximately 44% of the Company's revenue in 2010.

24.    DocAlerts were short messages and clinical headlines that appeared on the home screen of the Epocrates application.   New messages were transmitted to users when they connected with the Company's databases to receive updated content.   The total number of messages was limited to three or four at a time.   At least one (but not more than two) of the three to four messages was sponsored content from Epocrates' pharmaceutical company customers, on topics such as new clinical studies, drug indications, or formulary updates.   The rest were informative articles produced by Epocrates on topics such as drug approvals, drug safety alerts or recalls, and disease updates.   At the time of the IPO, almost 30% of the six million DocAlerts messages delivered per month were sponsored.   Each sponsored message was available to users for four weeks.

### 2.    The Regulatory Environment for DocAlerts

25.    Because sponsored DocAlerts promoted the use of certain pharmaceutical products on behalf of paying clients, such messages could be subject to regulatory scrutiny by the Federal Drug Administration ("FDA") or the Federal Trade Commission ("FTC").   As the Company acknowledged in its Registration Statement: "Information that promotes the use of pharmaceutical products or medical devices that we disseminate on behalf of our clients is subject to the full array of the FDA and FTC requirements and enforcement actions."

26.    During the Class Period, Epocrates and its competitors awaited guidance from the FDA regarding drug promotion via the internet and social media.   As the Registration

Statement explained: "In November 2009, the FDA held hearings and solicited comments concerning its regulation of the promotion of pharmaceuticals and other medical products using the Internet and social media tools, indicating its concern about activities in these forums and its intention to consider additional regulations in this area.  There is a reasonable possibility that Congress, the FDA or the FTC may alter their present policies on the advertising of prescription drugs or medical devices in a material way."  Thus, there was confusion in the market as to the extent such FDA guidance would apply to DocAlerts, or would delay their dissemination to Epocrates' users, because they were not directed to consumers.

27.     Nonetheless, sponsored DocAlerts were, in fact, subject to pharmaceutical companies' internal regulatory approval. CW4, a freelance medical copywriter for Epocrates from July 2001 through 2012, who wrote hundreds of DocAlerts, explained this process.  Each pharmaceutical customer had a regulatory team that reviewed all sponsored DocAlerts, and before each message could be released, it had to pass this regulatory review.  There were separate so-called "regulatory queues" for each type of drug.  The regulatory teams at certain pharmaceutical companies, such as Merck, were "savage" in their review because the FDA's Division of Drug Marketing, Advertising, and Communications had been difficult to work with, and pharmaceutical companies assiduously sought to avoid its scrutiny.

**B.     Defendants' Scheme to Prematurely Recognize Revenue and Conceal the Company's Inability to Timely Deliver Contracted DocAlerts**

28.     When Defendants were made aware in January 2011 of the delays caused by expanding regulatory queues, it became clear that certain undelivered DocAlerts under existing contracts would not be delivered in 1Q 2011 and, consequently, revenue would be substantially lower than projected for that quarter.

29.     Defendants' scheme to prematurely recognize revenue by cancelling and renegotiating DocAlert contracts plugged this revenue gap.  When the original contracts were cancelled, Defendants recognized revenue on the delivered contracts (to the extent that revenue had yet to be recognized) and for undelivered DocAlerts on the basis of the "use it or lose it"

clauses contained in the contracts.  To preserve their business relationships, Defendants then compensated customers for the forfeiture of their deposits by providing future discounts, additional DocAlerts or other services in the replacement contracts.  In this manner, Defendants swapped out the unused obligations to deliver DocAlerts in the old contracts for future obligations and, consequently, prematurely recognized revenue in 1Q 2011.

30.     The practical effect of this scheme was to waive the "use it or lose it" rights in the original contract and extend the time of performance or amend its deliverables under Epocrates' business arrangement with its major pharmaceutical customers so that the earnings process for the original contract's unused DocAlerts was not complete.  As several CWs explained, the repapering exercise was driven solely by Defendants' desire to avoid reporting Epocrates' true lower revenue in 1Q 2011 – *i.e.*, to mislead investors – and had no legitimate business purpose.

31.     CW1 explained that, in the first half of February 2011, the Company began convening daily revenue meetings to address the "hole" in the revenue forecast caused by the delayed release of DocAlerts due to prolonged regulatory queues (the "Revenue Meetings").  In addition to CW1, regular attendees at these meetings included Defendants Crane and Spangler; Chief Commercial Officer Joe Kleine; Chief Accounting Officer Podbere; Director of Finance Hart; and the account management team.  CW1 stated that the Revenue Meetings continued through the end of 1Q 2011 and into 2Q 2011.

32.     CW1 noted that Joe Kleine was uncomfortable about what was going on, and felt that his sales team should have been booking new business instead of renegotiating contracts, but during the meetings Crane and Spangler told Kleine they had to hit the numbers and his team had to renegotiate the contracts.  CW1 noted that 2010 had been a great booking year, but that having the sales team spend time redoing all the contracts instead of booking new business had an impact on long-term revenue.  CW5 confirmed that he and his sales teams had their efforts redirected to focus on revenue recognition instead of selling.

33.     According to CW1, during the Revenue Meetings, which lasted up to one hour each day, the attendees scrutinized each customer contract – and every DocAlert contract in particular – to identify opportunities to immediately recognize revenue to fill the 1Q 2011 revenue gap.  As CW1 explained: "If there was a deal that we could not recognize, we would have the customer cancel and negotiate a new contract" that would allow the Company to recognize additional revenue in 1Q 2011 while effectively offering free or discounted future products to maintain its customer base.  CW1 added that to get a pharmaceutical customer to repaper a contract, the Company had to ensure the customer was "made whole" by providing future discounts or supplemental services.

34.     According to CW1, to effectuate Defendants' scheme, each account manager provided a revenue number and the expected launch date for each DocAlert.  These revenue numbers were then input into a scorecard.  Using the scorecard, the account management team decided which customer's revenue could potentially be moved into 1Q 2011.  The account managers for these customers were then given two choices: either find a way to recognize revenue under the existing contract, or cancel and renegotiate the DocAlert contract.

35.     CW2 explained that AstraZeneca, GlaxoSmithKline, Eli Lily and Pfizer had big contracts for DocAlerts that were not fully met.  CW2 was personally involved with the repapering of contracts.  Although many of these contracts had not yet run their course (*e.g.*, there might have been two months remaining on a contract), CW2 was directed to cancel them and replace them with newer contracts that had been negotiated by the account management team.

36.     According to CW2, services that had not been delivered under the old contract were exchanged for something else under the new contract.  Without identifying which contracts received which incentives, CW2 provided examples of the incentives, including more DocAlerts, and instances when unused DocAlerts were exchanged for surveys.  CW2 stated that to incentivize customers to agree to repaper their contracts, they were, at times, given discounts that were applied to the new contracts.  CW2 stated that the contract repapering did not comply

with Epocrates' own revenue guidelines that had been written by its Corporate Controller, Jim Sullivan.

37.     CW7, a Regional Vice President and Sales Director from 2008 to late 2011, confirmed that he had to offer incentives – for example, trading three unused DocAlerts in the existing contract for four in the new contract (thus offering effectively a "free" alert) – in order to convince his customers to renegotiate.

38.     CW5 stated that each of his pharma clients who cancelled and renegotiated their contracts were given a different incentive and gave examples such as enhanced product listing or products with a messaging component.  CW5 stated that they only negotiated restructured contracts with their best clients and that in each case they would open a new contract with equal or more value to the customer.  CW5 was unwilling to identify his clients because he has on-going relationships with them.  CW5 said he was uncomfortable about how the contracts were restructured, and that beginning in February 2011 he complained to his supervisor Joe Kleine, then the Company's Chief Commercial Officer, on a monthly basis.

39.     Defendants' fraudulent  scheme to prematurely recognize revenue by cancelling and renegotiating DocAlert contracts: (i) misled investors about the Company's true business trends – expanding regulatory queues – that were having a material, negative impact on the Company's prospects; (ii) overstated revenue and allowed the Company to meet market expectations for 1Q 2011; and (iii) created the false appearance of a revenue growth trajectory in 1Q 2011 that could not be sustained and ultimately was not sustained in 2Q 2011.  As is more fully described below, the "repapering" practices also made a long list of the Company's assertions in its SEC reports about its business risks and significant revenue recognition practices, as well as its compliance with GAAP and SEC rules, false and misleading.

### C. How the "Repapering" of DocAlert Contracts Wrongfully Inflated Revenues and Affected Analysts' Perception of the Company's Value

40. As Epocrates' 2010 Form 10-K[3] explained, the Company could (and did, before the IPO) recognize revenues for its DocAlert business only when the following four requirements were satisfied:

- there is persuasive evidence that an arrangement exists, in the form of a written contract, amendments to that contract, or purchase orders from a third party;

- delivery has occurred or services have been rendered;

- the price is fixed or determinable after evaluating the risk of concession; and

- collectibility is probable and/or reasonably assured based on customer creditworthiness and past history of collection.

(Ex. A at 53).

41. The revenue recognition policies which, in its SEC reports, Epocrates stated that it followed, are fundamental "revenue recognition" requirements under generally accepted accounting principles ("GAAP"). *See, e.g.*, SEC Staff Accounting Bulletin ("SAB") Concept 13 at 1-2.[4] The SEC has warned that "side agreements," including with respect to "cancellation" or "termination" clauses, or significant transactions with unusual terms and conditions, may be indicative of a situation where the transaction is incomplete or the sales price is not "fixed or determinable."

42. Because Epocrates' customers paid fees for the future delivery of DocAlerts, before the DocAlerts were delivered (and, for bundled contracts, before other related services were completed), customer payments on these contracts were initially recorded as "deferred revenue." When DocAlerts and other inter-related services were delivered, the deferred revenue was then converted and recognized as revenue. Because the prepaid fees were "non-refundable" – *i.e.*, the contracts contained "use it or lose it" provisions – if the DocAlerts were

---

[3] Excerpts of the 2010 Form 10-K are attached hereto as Exhibit A ("Ex. A").

[4] SAB Concept 13 is attached hereto as Exhibit B ("Ex. B").

not provided by the pharmaceutical companies within the required timetable, Epocrates could have reported revenues at the expiration of the contract, but only if no additional future services, benefits or accommodations were provided to the customer in return for the forfeiture of monies prepaid under the contract.  In such a case, the "earnings process" would have been completed when the original contract ended.  If, as was the case here, Epocrates systemically waived the forfeiture provisions by providing other consideration, such as future discounts or future marketing surveys, so that the pharmaceutical companies were "made whole" by services of products *delivered in the future*, then the "earnings process" was not completed at the time the contract ended and the revenue could not be recognized under GAAP.  *See, e.g.*, SAB Concept 13, Ex. B, at 15-17.

43.     As CW8, Epocrates' former Director of Revenue from January 2011 through August 2012 who was responsible for recognizing revenue under the Company's contracts, explained, once a contract came to an end and the customer had no more rights under the contract, it was possible to recognize the revenue associated with undelivered elements.

44.     However, as further described below, after the IPO, Epocrates "cancelled" the contracts often before they were set to expire, and then made the customers "whole" through the delivery of other services or benefits *for the customer* in the "new" arrangements.  This practice rendered the Company's disclosures concerning its critical accounting policies materially false and misleading because Epocrates was no longer recognizing revenue in compliance with FASB's guidance for multiple element arrangements.

45.     The Company represented in its 2010 Form 10-K that it allocated a portion of the contract consideration (i) to each DocAlert message when DocAlerts were sold on a standalone basis, or (ii) to each service in a multiple service contract, and recognized revenue ratably over the delivery period of each DocAlert in a standalone contract or of each service in a bundled contract.  *See* Ex. A at 29.  Once, however, the Company started the practice of early cancellations of the contracts, and changed the "consideration" that Epocrates effectively provided in exchange for the fee prepayments, the revenue allocated to delivered and

undelivered units were no longer "fixed" or "determinable" – one of the four requirements that Epocrates stated it had to satisfy before it recognized revenue.

46.     In addition to affecting the timing of revenues, the delays in the regulatory approvals for the delivery of DocAlerts and similar products by Epocrates to its healthcare users also translated into long-term revenue losses and reduced profitability for at least three reasons.

47.     First, as described by CW9, an engineer who worked on the systems for distributing DocAlerts to users, there were constraints on how many DocAlerts could be delivered to Epocrates' on-line users (particularly doctors in specialties that pharmaceutical companies sought to target) over a particular period of time, so that delayed DocAlert deliveries often translated into lost deliveries and lost revenue.

48.     Second, extending the period it took to complete the delivery of a DocAlert increased the "fixed" or period-related costs, such as rent or officers' salaries, per DocAlert so that the DocAlert business was less profitable if DocAlerts could not be delivered on the original schedule in their contracts.  Because so much of the on-line DocAlert business involved "sunk" costs, such as past research and development expense, or other "fixed" costs, each additional dollar of DocAlert business directly translated into a much higher increase in earnings.

49.     And, finally, the generation of new DocAlert business suffered when Epocrates' sales staff were directed to re-focus their efforts on convincing their pharmaceutical company clients to cancel past contracts and negotiate accommodations for the cancellations.  This lower level of new business first showed up in lower amounts of "contracted for" business (part of the quarter end "backlog" which the Company tracked but which it no longer disclosed to investors after 4Q2010) and then in the Company's "deferred revenues."  Epocrates' 2011 annual Form 10-K confirmed that not only had Epocrates' 2Q 2011 sales revenue suffered, but that the annual interactive services' "deferred revenue" and total backlog had dropped substantially since 2010 – *i.e.*, total 2010 backlog of $86.4 million had dropped to $79.2 million at December 31, 2011, and that the decline was "attributable to weaker than expected bookings in the second,

third and fourth quarters 2011."  Moreover, as the 2011 Form 10-K further explained, this loss of business would continue to have even greater adverse effects on the Company's long-term prospects: "while the backlog shortfall had little revenue effect in 2011, it will have considerable impact on 2012 revenue."

### D. The Fraudulent Scheme Is Described By High-Ranking Former Managers and Other Knowledgeable Witnesses

#### 1. The Confidential Witnesses' Senior Positions on the Company's Finance and Sales Teams

50.     Highly placed executives in the Company's finance team – confidential witnesses "CW1," "CW2," and "CW3" – have described that Defendants were aware of expanding regulatory queues prior to the IPO, and engaged in a fraudulent scheme to prematurely recognize revenue and conceal the Company's inability to timely deliver contracted DocAlerts.  Specifically, Defendants engaged in a frantic effort to cancel and renegotiate the Company's contracts with its customers for the express purpose of misleading investors about the Company's financial condition and prospects by touting the increasing amounts of revenues it was earning, including DocAlert revenue, in 1Q 2011.

51.     CW1 was a Senior Manager of Financial Planning and Analysis for Epocrates from September 2010 through December 2011.  In the finance team's reporting chain, CW1 was just one step removed from Defendant CFO Spangler.  CW1 reported directly to the Director of Finance, Mike Hart, who, in turn, reported directly to Spangler.  The duties of CW1 included preparing financial forecasts for each fiscal quarter, ***which Defendants Crane and Spangler used to issue financial guidance to the market***.  CW1 prepared financial forecasts every month, including for DocAlert revenue.  CW1 also regularly attended meetings of the general sales team.

52.     CW2 was a Senior Revenue Accounting Manager for Epocrates from January 2007 through May 2011.  CW2 reported that one of the reasons she left Epocrates in May 2011 was due to concerns regarding how revenue was being recognized.  CW2 reported directly to

the Director of Revenue Accounting, first Henry Wong and later Steven Ndiritu, who replaced Wong in January 2011. In the finance team's reporting chain, Wong and then Ndiritu reported to the Corporate Controller, Jim Sullivan; Sullivan reported to Chief Accounting Officer Burt Podbere; and Podbere reported to Defendant CFO Spangler.

53.     CW3 was Vice President of Sales Operations and Business Systems for Epocrates from sometime in 2005 through March 2011. In the finance team's reporting chain, CW3 was just one step removed from Defendant CFO Spangler. CW3 reported directly to Chief Accounting Officer Podbere, who, in turn, reported to Spangler. While running the deal desk in operations, CW3 was directly exposed to the Company's revenue recognition policies and practices.

54.     CW5, a Senior Vice President of Sales from 2003 through October 2011, and who described himself as the "face of the company" for clients, was directly involved in the repapering exercise. He explained that, prior to the IPO, when there were delays by pharmaceutical customers in producing the Docalerts, it was his practice and the practice of his sales teams to extend their Pharma customers' contracts so that they would receive full value for their payments. CW5 explained that at a time when he and his teams were exceeding their goals for closing new business, two days after the IPO, he was summoned to Epocrates' New Jersey office and redirected to focus on revenue recognition instead of selling. He said he and his teams were directed to aggressively go after clients to get their DocAlerts out the door and renegotiate contracts so Epocrates could recognize revenue more quickly.

55.     CW3 confirmed that, pre-IPO, the Epocrates' sales force regularly granted extensions of the contract period to its large pharmaceutical clients, and CW3 referred to the "use it or lose it" clauses in the contracts as "the big stick" that Defendants used to persuade customers to repaper their contracts.

2.    **CWs Confirm Defendants' Knowledge, Prior to the IPO, of Expanding Regulatory Queues and the Company's Resulting Inability to Timely Deliver Contracted DocAlerts**

56.    CW2 confirmed that, prior to the IPO, releases of DocAlerts were being delayed by prolonged regulatory queues, which precluded the Company from recognizing significant amounts of revenue on the Company's most important service.    CW2 stated that GlaxoSmithKline, AstraZeneca, Eli Lilly, and Pfizer each had high-value DocAlert contracts with Epocrates that had not been fulfilled because their sponsored messages were languishing in regulatory queues and were not yet released.    For this reason, bookings for the undelivered parts of these large DocAlert contracts could not be recognized as revenue.

57.    According to CW2, the problem of expanding regulatory queues and the resulting delays in DocAlert delivery and revenue recognition were known to senior management approximately 30 days before the Company's February 1 IPO.    Indeed, CW2 stated that senior management brought in Ndiritu as Director of Revenue in January 2011 specifically to find a way to recognize revenue.

58.    CW1, whose preparation of financial forecasts entailed analyzing the Company's deferred revenue on its DocAlerts and projecting when such revenue would be recognized, also confirmed that revenue recognition was delayed and that, as a result, the Company's forecasted revenue could not be achieved.    By the first half of January 2011, while preparing the 1Q 2011 forecast, CW1 realized that there was "a big hole" in the revenue for the quarter and, consequently, the Company was not expected to meet its internal 1Q 2011 revenue forecast. CW1 stated that a substantial cause of the shortfall were regulatory queues that created delays in the timely delivery of DocAlerts and the recognition of revenue on DocAlert contracts.    When CW1 brought this revenue projection analysis to the attention of Director of Finance Michael Hart, he confirmed CW1's conclusions.

59.    Hart and CW1 met with Defendants Crane and Spangler and other members of senior management, including Joe Kleine and Burt Podbere, the Chief Accounting Officer, to address CW1's revenue analysis.    This meeting occurred in January 2011, before the

Company's February 1 IPO.  During the meeting, the attendees determined that they needed to narrow the gap between the Company's prior 1Q 2011 revenue forecast and CW1's updated analysis of projected revenue.

60.     CW3 confirmed that the Company's management became aware of a significant shortfall in revenue in January 2011, and, along with CW1 and CW2, described how senior management adopted a fraudulent plan to fill the revenue gap by accelerating as much revenue as possible into 1Q 2011 through secretly cancelling and renegotiating customer contracts. According to CW3 the repapering scheme was first discussed at a quarterly sales conference at the Four Seasons Hotel in San Francisco in January 2011.  CW6, a Regional Vice President during the period of 2008 to 2011, also recalled the sales meeting in San Francisco.  At the meeting he heard two of Epocrates' pharmaceuticals sales representatives, Eric Pepper, who sold to Eli Lilly and Company, and Kerry Valdesalice, who sold to AstraZeneca and Merck, discussing the repapering of contracts.

61.     The accounts of CW1, CW2, and CW3 make clear that Defendants were well aware that they were engaged in a serious scheme to mislead and defraud investors about the Company's revenues and earnings.  The fact that Defendants either terminated or demoted those who protested their accounting manipulations further confirms that they were not engaged in a mere disagreement about technical accounting requirements.  According to CW1, during the Revenue Meetings, GAAP provisions governing revenue recognition were frequently discussed, and the Company's senior financial management (other than Defendants Crane and Spangler) informed Defendants that repapering contracts to plug the 1Q 2011 revenue gap was improper. Indeed, CW2 reported that it was clear that the Company was manipulating the timing of revenue recognition in violation of its own stated accounting policies, as well as GAAP.

62.     Prior to the February 1 IPO, an email exchange occurred between the Vice President of Sales Operations, Rene Ochoa, and Chief Accounting Officer Podbere, in which Ochoa presented his objections to Defendants' scheme.  Defendants Crane and Spangler, the revenue accounting team (including CW2), and the account management team were all included

in this email exchange.  According to CW2, Ochoa stated in his email that the practice of using renegotiated DocAlert contracts to manipulate revenue recognition was unethical.  In reply, Podbere admonished Ochoa not to discuss the topic ever again.  CW2 stated that Ochoa was subsequently terminated.

63.     According to CW3, Director of Revenue Accounting Wong also resisted the scheme and refused to prematurely recognize revenue.  Consequently, in January 2011, senior management relieved Wong of his position and replaced him with Ndiritu.  The demotion led Wong to leave the Company in August 2011.

64.     CW3 protested Defendants' scheme as improper.  In January 2011, CW3 sent an email to Chief Accounting Officer Podbere and Defendant CFO Spangler, among others, stating that repapering contracts to manipulate revenue recognition was inconsistent with the Company's stated accounting policies and with GAAP.  CW3's information also confirms that the Defendants' accounting manipulations involved material amounts.  CW3 had been managing the deal desk and observed approximately ten large deals in which an existing contract was cancelled before it had expired and a new contract was executed to recognize additional revenue.  These repapered contracts involved the Company's largest customers, including GlaxoSmithKline, AstraZeneca, and Eli Lilly.  CW3 believed the Company was manipulating the timing of revenue recognition and stated this belief to Podbere and Defendant Spangler.  Within two months, CW3 was terminated.

### 3.     Defendants' Inability to Recognize Sufficient Revenue to Meet Market Expectations in 2Q 2011

65.     CW1 was surprised that the Company was able to recognize enough revenue in 1Q 2011 to meet its internal revenue forecast.  To do so, Defendants Crane and Spangler placed enormous pressure on the finance and account management teams.  In 2Q 2011, however, the Company fell short of its internal revenue forecast.  CW1 explained that one could not accelerate revenue indefinitely, especially when bookings started to slip, as they did in 2011 due, in part, to the diversion of sales staff to the repapering exercise (after 4Q 2010, the

Company stopped disclosing quarterly bookings). As CW1 explained, by renegotiating the contracts for DocAlerts, the Company was just "robbing Peter to pay Paul." According to CW1, having the sales team spend time redoing all of the existing contracts instead of booking new business also had an impact on bookings in the first two quarters – *i.e.*, Defendants were too busy convincing their customers to assist them in manipulating their books to generate actual new business. CW5 protested this on a monthly basis to Joe Kleine, and Kleine conveyed his own discomfort about what this practice would do to long-term revenues at the Revenue Meetings.

66. CW2 likewise stated that after the Company had pulled out all the stops to meet its 1Q 2011 revenue forecast, CW2 and the rest of the revenue accounting team wondered how the Company could possibly meet its 2Q 2011 revenue expectations, because there were not enough customer contracts left that could be repapered.

67. As alleged in paragraphs 47 and 49, *supra*, there were two other reasons why the Company's repapering scheme was merely a temporary band-aid on a serious wound caused by expanding regulatory queues. First, there were natural constraints on how many DocAlerts could be delivered over a particular period, so delayed DocAlert deliveries often translated into lost deliveries and lost revenue; the repapering scheme could not ameliorate this problem. Second, the repapering scheme diverted the Company's sales force from generating new billings. Because the sales staff was focused on cancelling and renegotiating existing contracts, rather than generating new ones, the Company reported weaker bookings and a backlog shortfall in 2011. Because of these facts, which were obvious to Defendants throughout the Class Period, the repapering scheme was unsustainable and incapable of propping up the Company's revenue past 1Q 2011.

68. These doubts were well founded. In an analyst report dated August 10, 2011, discussing the Company's reported financial results in 2Q 2011, William Blair & Co. ("William Blair") stated: "Epocrates reported weaker-than-anticipated second quarter 2011 results that missed consensus expectations on both the top and bottom lines. More specific, sales grew

10.2% year-over-year, to $27.9 million, which missed the consensus target by roughly $1.7 million."

69.    On September 21, 2011, within two months after Defendants' scheme had failed to achieve its intended result in 2Q 2011, the Company announced that Chief Accounting Officer Podbere was resigning.  The Company in its annual report for 2011 reported that its "backlog" (the deferred revenue plus contracted-for DocAlerts business) was significantly down versus 2010, which was expected to have a "considerable" impact on 2012 revenues.

## V.    DEFENDANTS' MATERIAL MISREPRESENTATIONS AND MISLEADING OMISSIONS DURING THE CLASS PERIOD

70.    As confirmed by three senior executives in the Company's finance team (§IV.D., *supra*), by January 2011 at the latest, Defendants were fully aware that expanding regulatory queues were significantly impairing the Company's ability to timely deliver the DocAlerts specified in its contracts, which had serious implications for the Company's business prospects and stock price.   Nevertheless, throughout the Class Period, Defendants falsely touted the strength of the Company's DocAlerts business and revenue growth trends, while concealing the adverse impact that regulatory queues were having on the Company's true revenues and earnings.   This scheme caused the Company's disclosures of risks, trends, and revenue recognition policies to be false and misleading.   Furthermore, Defendants' scheme that prematurely recognized revenue violated its own revenue recognition rules as well as GAAP.

### A.    Materially False or Misleading Statements and Material Omissions in the Company's Registration Statement

**False and Misleading Risk Disclosures**

71.    On February 1, 2011, the day of its IPO, the Company filed its final Registration Statement with the SEC on Form S-1/A.[5] The Registration Statement provided the following statements, in relevant part, regarding the regulatory environment for DocAlerts:

---

[5] Amendment No. 8 to the Registration Statement, filed on February 1, 2011, was not a full Form S-1/A but contained only the text of a small revised section not relevant to the allegations in this complaint. The last complete Form S/1-A was Amendment No. 7 filed on

We provide services involving promotion of prescription and over-the-counter drugs and medical devices. Any increase in regulation of these areas by the FDA, the Federal Trade Commission, or FTC, or other governmental bodies at the federal, state or local level, could make it more difficult for us to contract for certain of our interactive services. Physician groups and others have criticized the FDA's current policies and have called for restrictions on advertising of prescription drugs and for increased FDA enforcement. In response, the FDA has conducted hearings and sought public comment regarding its regulation of information concerning drugs on the Internet and the relationships between pharmaceutical companies and those disseminating information on drugs. We cannot predict what actions the FDA or industry participants may take in response to these criticisms. It is also possible that new laws would be enacted that impose restrictions on such marketing and advertising. ***Our interactive services revenues could be materially reduced by additional restrictions on the marketing or advertising of prescription drugs and medical devices, whether imposed by law or regulation or by policies adopted by industry members.***

\*      \*      \*

Any increase in FDA regulation of the Internet or other media for advertisements of prescription drugs could make it more difficult for us to obtain advertising and sponsorship revenue. ***In November 2009, the FDA held hearings and solicited comments concerning its regulation of the promotion of pharmaceuticals and other medical products using the Internet and social media tools, indicating its concern about activities in these forums and its intention to consider additional regulations in this area. There is a reasonable possibility that Congress, the FDA or the FTC may alter their present policies on the advertising of prescription drugs or medical devices in a material way. We cannot predict what effect any such changes would have on our business.***

(Emphasis added.)[6]

72.     The Registration Statement also vaguely addressed the potential for delays resulting from clients' internal approval processes:

> ***[T]he time between the date of the signing of the contract with a client for a program, the actual fulfillment of the services under such contract and the revenue recognition associated with such revenues may be lengthy, especially for larger contracts with multiple deliverables, and may be subject to delays over which we have little or no control, including those that result from the client's need for internal approvals.***

---

January 31, 2011. Thus, any quoted portions of the Registration Statement are taken from Amendment No. 7.

[6] All emphasis is added unless otherwise noted.

73.     The Registration Statement was materially false and misleading and omitted material information necessary to make it not false and misleading because problems that the Company might incur in the future had already materialized.  Thus,

a.     Although DocAlerts were directed to healthcare professionals, and not to consumers, the Company's pharmaceutical customers nonetheless were subjecting sponsored DocAlerts to the same regulatory approval process as other direct-to-consumer ("DTC") marketing activities.

b.     As pharmaceutical companies awaited guidance from the FDA relating to drug advertising on the Internet and in social media, they were increasingly delaying their marketing activities.

c.     Further, as a result of regulatory uncertainty, pharmaceutical companies were subjecting their marketing activities on the Internet and in social media to careful scrutiny during their internal regulatory approval processes.

d.     At the same time, the number of drug promotion programs delivered through the Internet and social media was growing rapidly.

e.     All of these factors resulted in expanding regulatory queues, which were, in fact, already delaying the required approval by pharmaceutical companies of each DocAlert before it could be released.

74.     Further, the risk warnings in the Registration Statement contained materially false or misleading statements or material omissions in that Defendants failed to disclose the known material trends, which effectively concealed that expanding regulatory queues had already impaired the Company's ability to timely deliver the DocAlerts specified in its contracts, which was having a negative impact on revenue.

75.     In part due to the material misrepresentations and omissions contained in the Registration Statement, Epocrates successfully completed its IPO in February 2011, consisting of 4.4 million primary shares (including 800,000 over-allotment shares) and 1.8 million secondary shares sold entirely by its private-equity owners.  The offering was priced at $16.00

per share.  It was estimated that the Company netted roughly $65 million in proceeds from the offering, offset by just under $30 million to satisfy a preferred stock dividend.  Pursuant to this offering, Defendant Crane stood to reap significant income on the sale of her nearly 450,000 shares of Epocrates stock provided she was able to sustain the illusion of the Company's growing revenues beyond the period of the lock-up agreement entered in connection with the IPO.

76.     Defendants' material misrepresentations and omissions led analysts to conclude that the regulatory risk posed to Epocrates was negligible.  For example, William Blair, in an analyst report initiating coverage on March 14, 2011, stated:

> Potentially directly related to Epocrates' business is the FDA's intention to provide more-specific digital marketing guidelines for pharmaceutical companies. We believe the context of these regulations is more focused on the consumer, given examples of pharmaceutical companies using social networking sites to reach patients. . . . ***With no exposure to DTC [direct-to-consumer] advertising regulations, and with little, in our view, that seems to threaten the type of marketing engagements that Epocrates targets, we do not believe there is an immediate or identifiable risk with respect to the company's business related to the regulatory environment***.

77.     Relying in part on Defendants' material misrepresentations and omissions, analysts initiated coverage of Epocrates with a positive outlook for the DocAlerts business. Morgan Keegan & Co., Inc. ("Morgan Keegan"), in an analyst report initiating coverage on February 10, 2011, estimated that DocAlerts would bring in an estimated $25 million of revenue in 2011.  In addition, J.P. Morgan, in an analyst report initiating coverage on March 14, 2011, projected that DocAlerts would grow 15-20% "over the foreseeable future."

### B.     Materially False or Misleading Statements and Material Omissions During Defendants' Discussion of 2010 Results

**False Statements and Omissions Regarding the Continuing Strength of the DocAlerts Business and the "Visibility" that the Company's Backlog Provided for Later Revenue Reporting**

78.     In the March 29, 2011 press release that Defendants issued (attached to the 4Q 2010 Form 8-K) announcing the Company's financial results for 4Q 2010 and FY 2010, Defendant Crane is quoted as stating: "***We are beginning to see positive momentum*** from the

incremental investments we have made throughout 2010 to expand our portfolio of products targeted to the pharmaceutical industry, ***including line extensions for our flagship DocAlert® product offering*** and the launch of a suite of virtual representative services." For 2010, sales of virtual representative services contributed about $2 million or 2% of the Company's revenue.

79.      Also on March 29, 2011, Defendants Crane and Spangler held a conference call with analysts. During this call, Defendant Spangler stated: "The increase in interactive service revenue was driven by the launch of new services including line extensions for our flagship DocAlert product line and the launch of our suite of virtual representative services." He later stated: "***We continue to have high visibility into our revenue given both our consistent level of deferred revenue and our growing contractual backlog. As of December 31st, we have $55 million of deferred revenue on our balance sheet along with $31.5 million of contractual backlog, which gives us over 80% visibility into our next quarter's revenue and 60% visibility into our revenue for the coming 12 months***."

80.      Significantly, the foregoing statement regarding "visibility" concerned the relationship between the amount of contractual backlog and deferred revenue as of December 31, 2010 and the amount of ***revenues expected to be earned and reported in the quarter that was about to end two days later, so that the representation entailed little uncertainty, if any, about "future" performance***. That deferred revenues could be used to reliably track the next quarter's revenue, as well as to indicate the majority of annual revenues, was nearly identical to the statement in a presentation during the roadshow for the IPO (video available at http://www.slideshare.net/EPOCFollower/epocrates-ipo-roadshow-presentation   [Spangler's statement is at 26:20-26:46 minutes]), stating:  "We have high visibility into our revenue given both our consistent level of deferred revenue and our growing contractual backlog.  As of September 30, we have $56 million of deferred revenue on our balance sheet, along with $23 million of contractual backlog, which gives us over 80% visibility into our next quarter's revenue and 60% visibility into our revenue for the coming 12 months." The slideshow handout for the road show also makes clear that Defendants touted deferred revenue as a reliable

predictor of revenue to be earned in the year.  In this regard, Slide 28 of the handout (available at http://www.slideshare.net/EPOCFollower/epocrates-ipo-roadshow#) states, (1) "Deferred Revenue on Balance Sheet Provides High Visibility into Next Quarter's Revenue," (2) "Contract Nature of Business Creates Additional Backlog Not Reflected in Deferred Revenue," and (3) "Total Backlog [which the Company defined as deferred revenue plus additional contractual backlog not reflected in deferred revenue] Creates High Visibility for Revenue in Coming 12 Months."  Thus, Spangler, at least, was tracking and knew the true amount and rate of rollover of deferred revenue into earned revenue for 1Q 2011.

81.    By March 29, 2011, Spangler, having sat through over a month of daily Revenue Meetings looking for ways to manipulate and accelerate the recognition of revenues for DocAlerts that were stuck in regulatory queues, knew that his statements were highly misleading.  The only reason that "80%" of the backlog was rolling over into recognized revenues was because of the Company's highly unorthodox, manipulative and undisclosed scheme to cancel and repaper its major Pharma company contracts.

**Defendants Repeat Their False Risk Disclosures From Epocrates Registration Statement**

82.    On March 31, 2011, the Company filed its FY 2010 Form 10-K, which reiterated the false statements regarding the regulatory environment for DocAlerts that were contained in the Company's Registration Statement.

83.    In contrast, WebMD Health Corporation ("WebMD"), Epocrates' closest competitor, was much more transparent with its investors about the impact of pharmaceutical companies' internal regulatory approvals. During WebMD's 4Q 2010 earnings call, an analyst asked "how WebMD can leverage pharma's interest in social media chats and specialized mobile applications [and] [w]hat kind of impact will the FDA's draft guidance on social media and the Internet expected to be released in the first quarter have on WebMD?"  WebMD's CEO answered in part by stating: "In terms of the monetization opportunity, *it is clearly today in the pharma markets inhibited by at least to date what the FDA has deemed allowable* and, simply said for the most part, pharma has precluded from promoting product inside of any community

discussions because you have the concern of off-label dialog in a community discussion being juxtaposed against on-label product promotion." Because WebMD, unlike Epocrates, was more reliant on DTC marketing activities, and also due to Defendants' misrepresentations and omissions, analysts did not connect the regulatory concern associated with WebMD to Epocrates' revenue performance.

84.    Because analysts were unaware of Epocrates' expanding regulatory queues, which had impaired the Company's ability to timely deliver contracted DocAlerts, they unknowingly accepted and touted Defendants' theme that the Company's backlog was an unqualified indicator of future revenue growth. For example, in an analyst report dated March 29, 2011, Piper Jaffray stated: "Key Growth Drivers Reported Favorably: Strong backlog and bookings growth driven by Pharma. . . . Bookings growth was led by healthy growth in ISR (Pharma) segment bookings, which grew 43% y/y." And in an analyst report dated March 29, 2011, J.P. Morgan stated: "The company ended 2010 with $55M in deferred revenue and $31.5M of backlog. Bookings in 4Q amounted to $37M and for 2010 totaled $110M. The deferred revenue and backlog provide approximately 60% visibility into 2011 revenues, which we view positively, especially since the balance of the revenue is lower-margin in nature."

### C.    Materially False or Misleading Statements and Material Omissions in the 1Q 2011 Form 10-Q and Other Public Disclosures of 1Q 2011 Results

85.    With respect to the reporting of 1Q 2011 results, Defendants (i) concealed a known business trend – expanding regulatory queues – that was having a material, negative impact on revenue; (ii) overstated revenue and allowed the Company to meet market expectations for 1Q 2011; and (iii) created the false appearance of a revenue growth trajectory in 1Q 2011 that could not be sustained and ultimately was not sustained in 2Q 2011. In addition, the repapering scheme caused several other disclosures in Epocrates' 1Q 2011 Form 10-Q to be false and misleading, including its risk disclosures and its descriptions of its revenue recognition practices, and that its reporting complied with GAAP and SEC rules.

**False and Misleading Statements and Material Omissions in the 1Q 2011 Form 10-Q**

86.     For First Quarter 2011 ("1Q 2011"), the amounts that were reported in the Form 10-Q as interactive services revenues ($22,968,000) and total revenues ($29,177,000) were materially misstated (and inflated) because they did not satisfy the revenue recognition requirements set forth in the Form 10-Q (or pursuant to GAAP).

87.     In the Form 10-Q's description of its "Critical Accounting Policies and Estimates," Defendants falsely asserted that there "***have been no significant changes in our critical accounting policies during the quarter ended March 31, 2011*** compared to those previously disclosed in Critical Accounting Policies and Estimates in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K."[7]  (Ex. C, at 22).   To the contrary, the recognition of revenues upon the cancellation and repapering of contracts with the major pharmaceutical companies during the first three months of 2011 constituted a significant change of accounting policies from the policies that had been used to report revenues through December 31, 2010.

88.     The Form 10-Q "Risk Factor" that there "may be" delays in fulfillment of services and revenue recognition "for the clients' need for internal approvals" (Ex. C at 37) is, again, false and misleading, without the disclosure that these delays have already materialized and are on-going.

89.     The Form 10-Q's assertion that the financial statements were prepared in accordance with SEC rules and regulations was false and misleading because the SEC bars "earnings management" (as described in SAB99), and requires the truthful disclosure of business "trends." *See* §VII, *infra*.  Finally, pursuant to Sarbanes Oxley, the SEC requires the Company's CEO and CFO to certify that the financial statements are free from material misstatements (which they did).   Each of these certifications were false and misleading as described in §§IV.B and VII. Since the revenues were materially misstated and "managed" by the repapering scheme, SEC rules were, in fact, violated.

---

[7] The 1Q 2011  Form 10-Q is attached hereto as Exhibit C ("Ex. C").

**False and Misleading Statements and Material Omissions in the 1Q 2011 Press Release and Earnings Call**

90.    The Company's May 10 press release, which, *inter alia*, touted the Company's false revenues and revenue growth trends, was also false and misleading.  In the press release, Defendant Crane was quoted as ***further*** emphasizing the quarter's extraordinary revenue growth, particularly in DocAlerts, as a harbinger of the Company's success.  According to Crane: "Our overall net sales growth was driven by a strong performance across both our subscription and interactive services businesses, which grew approximately 8% and 24%, respectively, versus the prior year quarter.  ***Notably, sales in our core pharmaceutical business, which include DocAlert® messages and virtual representative services, increased by over 40% during the first quarter of 2011 compared to the same quarter of the prior year.  These results reflect the growth in bookings that we saw in 2010 and the positive momentum we have generated from the investments we made to expand our product pipeline.***"

91.    Also on May 10, 2011, Defendants Crane and Spangler held a quarterly conference call with analysts.  During this call, Defendant Crane also falsely touted the Company's revenue growth in the DocAlert segment, repeating the statistics showing that revenues had sharply increased: "Notably, sales in our core pharmaceutical business, which include our flagship DocAlert messages and Virtual Rep Services, ***increased by over 40% during the first quarter of 2011*** compared to the same quarter of the prior year."  For his part, Defendant Spangler reiterated Company-wide revenue and earnings, also emphasizing the revenue growth attributable to the Company's DocAlert business: "Interactive service revenue was approximately $23.0 million for Q1 of 2011, representing a 23.6% growth compared to Q1 of 2010.  ***This increase was driven by DocAlert line extensions and the ongoing launch of our Virtual Rep Services***."

92.    Defendant Spangler also continued to tout the significance of the Company's backlog numbers to reliably calculate earned revenues in follow-on periods: "As reported in our last call, total backlog was $86.5 million at the end of 2011, which provides ***approximately 60%***

*visibility in the forecasted 2011 revenue* with the balance to be generated through new bookings throughout the course of 2011.  During Q1 of 2011, there was strong growth in total bookings, which was led by pharma bookings growth of 29%, in line with our expectations."

93.    During the May 10 conference call, a William Blair analyst asked: "[Y]our pharma bookings were very strong during the quarter, showing good momentum.  *One of your competitors last week indicated that they're seeing a little more hesitation actually on the pharma side to move toward digital media*, given some of the large [fines] in the corporate integrity agreements, and I'm curious if you've seen that at all.  It's obviously not reflected in your bookings, but *any of your customers getting a little more cautious on some of the novel programs* given those [CIAs]?"  Defendant Crane answered: "*Actually, we aren't seeing that trend.  It's been a very strong, steady growth in what we're doing with pharma in the digital space*."

94.    Epocrates' reported revenues for 1Q 2011disclosed on May 10, 2011 were materially false and misleading because they were artificially inflated in violation of GAAP to make it appear that booked contracts were rolling over into earned revenue in the ordinary course and allow the Company to meet market expectations for 1Q 2011.  As alleged in §VII, *infra*, based on (i) the regulatory queues delaying the release of DocAlerts, and (ii) the practice of cancelling and renegotiating customer contracts under different terms (*e.g.*, timing, deliverables, price, etc.), Defendants' practice of recognizing revenue on repapered DocAlert contracts violated GAAP, the Company's own disclosed revenue recognition policies, and the federal securities laws because (i) persuasive evidence of an arrangement did not exist; (ii) DocAlert revenue was not fixed or determinable; and (iii) contingent revenue features existed that precluded treating DocAlerts as separate units of accounting.

95.    The May 2011 disclosures providing or touting overall revenue, Interactive Services revenue, or DocAlert revenue in 1Q 2011were materially false or misleading or contained material omissions because they:

a.      concealed a known trend – expanding regulatory queues – that was having a material, negative impact on revenue;

b.      reinforced Defendants' misleading message that Epocrates was not suffering from the same regulatory problems that were befalling its peers; and

c.      created the false appearance of a revenue growth trajectory in 1Q 2011 that could not be sustained and ultimately was not sustained.

96.     Further, the May 10 disclosures contained the following additional materially false or misleading statements and misleading omissions:

d.      Defendant Crane's statement that "These results reflect the growth in bookings that we saw in 2010 and the positive momentum we have generated from the investments we made to expand our product pipeline" was misleading given her knowledge at the time that the Company's ability to recognize revenue was being stymied by expanding regulatory queues and that it was then engaged in the repapering scheme.  Crane's statement as to the reason for the revenue growth made her failure to reveal the repapering scheme a material and misleading omission.

e.      Defendant Spangler's statements touting the strength of the Company's backlog and so-called revenue "visibility" were misleading given his knowledge at the time that expanding regulatory queues had significantly impaired the Company's ability to recognize deferred revenue, rendering its revenue outlook highly opaque, and that it was engaged in the repapering scheme.   Spangler's statements connecting the Company's currently reported deferred revenues to expected earned revenues in future periods made his failure to reveal that reported revenues were in fact a result of the Company's repapering scheme a material and misleading omission.

f.      When an analyst asked whether the Company's "customers [were] getting a little more cautious" in the digital space, Defendant Crane's flat-out denial of such a trend, followed by a representation of "very strong, steady growth," was misleading, given that pharmaceutical companies' caution while awaiting FDA guidance

was the primary reason behind expanding regulatory queues, and Crane's failure to disclose those problems in light of her statements was a material and misleading omission.

97.     In contrast, during WebMD's 1Q 2011 earnings call, unprompted by an analyst's question, the CEO stated: "Reinforcing some of the comments that we made last quarter, ***we have been seeing an increasing level of marketing conservatism on the part of big pharma***, particularly among companies that are subjected to corporate integrity agreements with the government. ***The consequence right now is a more cautious and longer approval cycle from their internal medical and legal staff***, especially for the more innovative and sophisticated product solutions such as WebMD provides." Again, because WebMD, unlike Epocrates, was more reliant on DTC marketing activities, and by virtue of Defendants' false denial, analysts were misled into believing that the regulatory concern associated with WebMD was not a problem for Epocrates.

**Analyst Reports Show Defendants' False and Misleading Statements Were Material to the Market**

98.     Following Defendants' misrepresentations and omissions regarding 1Q 2011 financial results, Epocrates received glowing comments from analysts regarding the Company's better-than-expected reported revenue. For example, in an analyst report dated May 10, 2011, William Blair stated: "Revenue increased 20% year-over-year, to $29.2 million, or roughly $1 million ahead of the $28.2 million consensus forecast, highlighted by 40% revenue growth in the core pharmaceutical business." The report also stated: "By segment, Interactive Service revenue of $23 million (up 24% year-over-year) came in 5% above our $21.8 million estimate, driven by 40% growth in the core pharmaceutical solutions business."

99.     Analysts also focused on the Company's supposedly strong backlog. The May 10 William Blair report stated: "Bookings were strong, according to management, with pharmaceutical bookings up 29% on a year-over-year basis, driven by both the company's DocAlert extensions and its new Virtual Representative services." In addition, a Piper Jaffray

report issued on the same day stated: "While Epocrates did not update the bookings number, the company noted that their Q1 bookings were strong led by strong Pharma segment bookings which were up 29% y/y. We believe the new bookings are a reflection of the new product initiates in the past year. . . . We believe [DocAlerts and other "core offerings"] will continue to grow as the pharma industry trends are favorable to the digital adoption."

## VI.   THE TRUTH EMERGES: CORRECTIVE DISCLOSURES AND POST-CLASS PERIOD EVENTS

### A.   Defendants' Disclosure of 2Q 2011 Results

100.   On August 9, 2011, Defendants issued a press release (attached to the 2Q 2011 Form 8-K) announcing the Company's financial results for 2Q 2011: "Epocrates' net sales totaled $27.9 million in the second quarter of 2011 compared to $25.3 million in the same quarter of the prior year, an increase of 10.2%."   The press release also reported Interactive Services revenue of $21.8 million in 2Q 2011, compared to $19.5 million 2Q 2010.

101.   The Company finally disclosed the impact of expanding regulatory queues. In the August 9 press release, Defendant Crane is quoted as stating:

> With respect to our pharma revenue, which grew 18 percent in the second quarter of 2011 over the second quarter of 2010, *there are two factors which are impacting the timing of revenue growth. Due to expanding regulatory queues, we are experiencing delays in the launch of DocAlert® messages*. For our newer products, the time between contract signing and revenue recognition is taking longer than expected due to the size and complexity of these launches. *These factors impacted our second quarter revenue and are expected to continue to affect the timing of our net sales for the remainder of the year*. Accordingly, we are proactively updating our guidance to reflect the shift in timing.

102.   Citing expanding regulatory queues and the resulting revenue slowdown, the August 9 press release announced a downward revision to the Company's revenue guidance: "Epocrates has updated its expected full-year 2011 net sales guidance to be in the range of $115 million to $120 million, representing growth of 11% to 15% over full-year 2010."   The

Company's initial revenue guidance, announced when the Company reported 4Q 2010 and FY 2010 financial results on March 29, 2011, had been $122 million to $125 million.

103.    Also on August 9, 2011, Defendants Crane and Spangler held a quarterly conference call with analysts during which they took turns further explaining that expanding regulatory queues were interfering with the Company's revenue recognition.   In addition, Spangler suggested that the Company was altering contract terms to meet revenue recognition requirements:

a.    *Crane: "[D]ue to expanding regulatory queues with many of our pharma clients, we are experiencing delays in the launch of our DocAlert messages,"* which was one factor that *"impacted the timing of revenue growth."*

b.    *Spangler: "[O]ur second quarter revenues was impacted by the timing of revenue recognition from pharma contracts.  Revenue on some of these contracts which we anticipated recognizing in the second quarter was pushed out later into 2011 and 2012.  Given this issue, we're exploring modifications to our contract terms in an effort to allow for more predictability in the timing of our revenue."*

c.    *Crane: "The queue is just getting longer and so we're stuck in that queue.* But we're not having any issues getting our projects approved by regulatory. . . . What we're trying to do . . . is make it easier for them to get approval. . . .  We're going to keep an eye on this, I'm not sure that the queue will either lengthen or shorten."

d.    Crane: "[A]s [pharmaceutical companies] start to move more into the digital space, they have new types of programs to approve.  So, unfortunately, we sit in that queue with the other programs.  And so, it's just really taking it longer to finally get approved. . . .  What we're trying to do is provide them with more templated approaches, so that they can basically take something that's been approved and just add language on to it and get out of the queue faster."

104.    In addition, Defendant Spangler quantified the impact that expanding regulatory queues would have on the Company's FY 2011 revenue: "With respect to our revised guidance,

approximately, if you looked at the midpoint, it's $6 million delta between the two ranges before and after.  $4 million of that is pharma revenue due to timing shifts as we mentioned and approximately $2 million will be from [electronic health records] revenue."

105.    Following the August 9 disclosures, analysts noted that the Company's reported revenue for 2Q 2011 fell short of the market's consensus expectations.  For example, in an analyst report dated August 10, 2011, William Blair stated: "Epocrates reported weaker-than-anticipated second quarter 2011 results that missed consensus expectations on both the top and bottom lines.  More specific, sales grew 10.2% year-over-year, to $27.9 million, which missed the consensus target by roughly $1.7 million."  Moreover, as exemplified in an analyst report issued by J.P. Morgan on the same day, analysts attributed the revenue miss to "'longer queues' at pharma companies due to increased regulatory scrutiny on other digital communication channels by pharma," noting that the Company "expect[ed] the approval queues to remain elongated through early 2012."

106.    The August 10 William Blair report also explained how the market had so misapprehended the regulatory risk that Epocrates faced, in no small part due to Defendants' misleading statements and omissions:

> We have discussed this issue—*ad nauseam*—in prior notes on WebMD Health . . . , as the company first highlighted this challenge during its first-quarter earnings call and recently reduced its fiscal 2011 outlook to account for the issue.
>
> ***Previously, we felt that Epocrates would be able to avoid a similar headwind, as the company focuses on direct-to-physician communications versus WebMD's model of both direct-to-physician and direct-to-consumer advertising; the latter of which we thought was more at risk to FDA scrutiny and thus lengthening medical/legal reviews within pharma manufacturers.  In addition, Epocrates management indicated that it was seeing no such headwinds emerge on its May 10, 2011, earnings call, indicating (in response to a question) that, "we aren't seeing that trend. It's been a very strong, steady growth in what we're doing with pharma in the digital space.***
>
> Unfortunately, it appears that expansion of medical/legal reviews at pharma partners is simply lengthening the approval queue for all advertising and promotion vendors—even those, like Epocrates, that are not seeing any challenges to their service offerings.

107.    As a result of Defendants' August 9 disclosures, during the next trading day, the price of Epocrates stock plummeted $6.80, from $16.69 to a closing price of $9.89 on August 10, 2011, a 41% drop on heavy trading volume.

**B.    Relevant Events After the End of the Class Period**

108.    On September 21, 2011, the Company filed a Form 8-K disclosing that: "Burt W. Podbere notified Epocrates, Inc. that he is resigning from his position as Epocrates' Senior Vice President, Finance and Chief Accounting Officer, effective October 11, 2011."   Podbere's resignation occurred within two months after Defendants' scheme had failed to achieve the intended result of meeting the market's consensus revenue expectations in 2Q 2011.

109.    At the end of 3Q 2011, the Company again failed to report revenue that met the market's consensus expectation.   As Piper Jaffray summarized in an analyst report dated November 8, 2011: "EPOC missed numbers and lowered guidance for the second quarter in a row, citing continued delays in pharma spending, and execution challenges in pursuing enterprise sales of the new virtual rep products."   Likewise, an analyst report issued by William Blair on the same day stated: "Epocrates reported what we characterize as weaker-than-anticipated third quarter 2011 results.   More specific, total sales rose about $2.5 million (up 10.4%) from the year-ago period, to $26.6 million—roughly $1.1 million below the $27.7 million consensus forecast."

110.    Once again, the revenue miss was attributed to expanding regulatory queues.   For example, the November 8 William Blair report stated:

> Regarding end-market dynamics, management said that the issues that plagued the company during the second quarter—and led to last quarter's 2011 guidance reduction—continued to persist.   Recall that the main issue revolved around increased medical/legal review at pharmaceutical manufacturers (given heightened FDA scrutiny of pharmaceutical marketing practices), which is keeping some of Epocrates' programs stuck in the review pipeline (and thus deferring program rollouts and revenue recognition).

111.    On November 16, 2011, the Company filed a Form 8-K disclosing that, effective immediately: (i) Defendant Crane "ceased to be" President and CEO of Epocrates; and (ii) the

Board of Directors appointed Peter C. Brandt, who had served on the Board since February 2011, to serve as the Company's interim President and CEO.

## VII.   DEFENDANTS' PREMATURE RECOGNITION OF REVENUE AND REVENUE AND EARNINGS MANAGEMENT

112.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

### A.   Defendants' Scheme Violated Fundamental Requirements of the Securities Laws and U.S. GAAP

113.    Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim (*i.e.*, quarterly) financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

114.    The SEC prohibits the management of earnings.  Staff Accounting Bulletin No. 99 ("SAB 99"); and Staff Accounting Bulletin, Topic 13, *Revenue Recognition* ("SAB Topic 13").  SAB 99 provides that misstatements of a financial statement item for the purpose of managing earnings to mask a change in earnings or other trends or to hide a failure to meet analysts' consensus expectations for the enterprise are material under GAAP.

115.    In accordance with GAAP, specifically ASC Topic 605-10, *Revenue Recognition* ("ASC 605-10"), revenues cannot be recognized until realized or realizable and earned.  SAB Topic 13 reiterates the fundamental requirements of GAAP that revenues cannot be reported on a company's income statement until earned – which requires: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.  These are the same basic requirements for revenue recognition that Epocrates reported it followed in

its SEC reports.  The SEC in SAB Topic 13 explained these requirements, including terms such as "persuasive evidence of an arrangement," and a "fixed or determinable" price, including as they relate to arrangements involving upfront fees and multiple deliverables.

### B.   Defendants' Improper Recognition of DocAlerts Revenue

116.   In the "Summary of Significant Accounting Policies" section of its FY 2010 Form 10-K, the Company stated: "As discussed in detail under multiple element arrangements below, for contracts signed or materially modified on or after January 1, 2009, the Company allocates consideration to each [DocAlert] message based on the Company's best estimate of sales price ('BESP'), and recognizes revenue ratably over the delivery period of each message." In addition, the Company represented that "[a]ny discount . . . inherent in the arrangement is allocated to each element in the arrangement based on the relative fair value of each element." In other words, the Company purportedly treated each DocAlert as a separate "unit of accounting," recognizing revenue on each message as it was delivered, as opposed to waiting until all DocAlerts specified in the contract were delivered.

117.   For each DocAlert to qualify as a separate unit of accounting, and for the Company to recognize revenue as each message was delivered, however, the DocAlert transactions were required to satisfy all of the requirements provided in ASC 605-10 and SAB Topic 13.  Under ASC 605-10 and SAB Topic 13, the Company could recognize revenue only when all of the following criteria were met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.  Since Defendants recognized revenue before each of these requirements was satisfied, they violated GAAP.

118.   First, Defendants violated SAB Topic 13 because there was not persuasive evidence of an arrangement.  When Epocrates cancelled and renegotiated contracts as described above it was essentially entering into side agreements that amended the original contracts.  SAB 13.A.2, *Persuasive Evidence of an Arrangement*, provides that "[s]ide agreements that amend

the master contract would include cancellation or termination or other provisions that affect revenue recognition," and that such side agreements "may be an indicator that the original agreement was not final and revenue recognition was not appropriate." *See also* SAB Topic 13, attached as Ex. B.

119.   Second, Defendants violated SAB Topic 13 by recognizing DocAlerts revenue that was not fixed and determinable.  SAB 13.A.4, *Fixed or Determinable Sales Price*, provides that customer cancellation or termination clauses may exist in the form of "side" agreements, which raise questions as to whether the sales price is fixed or determinable.   Since the repapering scheme allowed Epocrates' pharmaceutical clients to negotiate discounts on both delivered DocAlerts that were bundled with indivisible services and undelivered DocAlerts for which revenue could not be recognized under the original contracts, the revenue Defendants recognized on the cancelled contracts pursuant to the repapering scheme was not fixed and determinable.

### C.   Defendants Failed to Comply with Disclosure Obligations and Thus Violated GAAP

120.   ASC 605-25-50-2 provides that "[a] vendor shall disclose all of the following information by similar type of arrangement," including without limitation: (i) "The general timing of delivery or performance of service for the deliverables within the arrangements"; (ii) **"Performance-, cancellation-, termination-, and refund-type provisions"**; and (iii) "The general timing of revenue recognition for significant units of accounting."  Defendants' failure to disclose the Company's practice of cancelling and renegotiating the terms of DocAlert contracts and the effects on the timing and amount of revenue recognition constituted a violation of this GAAP provision and caused the Registration Statement and subsequent financial statements to be materially false and misleading.

121.   In addition, Defendants' failure to disclose the Company's practice of cancelling and renegotiating the terms of DocAlert contracts and the effects on the timing and amount of revenue recognition also violated Item 303 of Regulation S-K.  Item 303, required Defendants

to describe, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues."

122.    Specifically, the Company was required to disclose the following qualitative and quantitative information under ASC 605-25-50-2 and Item 303:  (i) that the Company had adopted a policy of cancelling DocAlert contracts before all DocAlerts had been delivered under the original contract; (ii) that the Company's policy of cancelling contracts had the effect of prematurely recognizing revenue for undelivered DocAlerts in periods prior to the expiration of the original contract; (iii) that the renegotiated contracts included refund-type provisions that compensated the customer for the value of undelivered DocAlerts under the original contract; (iv) that the cancelling and renegotiation of DocAlert contracts with refund-type provisions affected the amount of revenue recognized in current and future periods; and (v) that the cancelling and renegotiating of DocAlert contracts had the effect of reducing bookings in current and future periods.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

123.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

124.    The Individual Defendants knew or with deliberate recklessness disregarded that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiff and other Class members.

125.    In addition to the foregoing allegations, the following facts support a strong inference that Epocrates and Defendants Crane and Spangler knew or with deliberate recklessness disregarded that the challenged statements alleged herein were materially false or misleading when made.

126.    As alleged in §IV.D, *supra*, each of the Defendants knew by January 2011 at the latest that the releases of sponsored DocAlerts were being delayed as they awaited approval in pharmaceutical companies' expanding regulatory queues.  Further, each of the Defendants had been informed by January 2011 that these regulatory delays would materially impact revenue in 2011, as DocAlerts accounted for at least 44% of the Company's overall revenue.  Based on their actual possession of this information, each of the Defendants either knew or recklessly disregarded that their disclosures relating to (i) revenue visibility, (ii) the strength of the Interactive Services segment and DocAlerts business, (iii) the Company's regulatory risk, (iv) risks relating to the "timing" of its revenues, and (v) the disclosure of its Critical Accounting Policies contained material misrepresentations and omissions.

127.    Moreover, as alleged in §IV.D, *supra*, each of the Defendants knew about and approved of the scheme to cancel and renegotiate customer contracts for the purpose of prematurely recognizing DocAlert revenue to meet revenue expectations in 1Q 2011. Indeed, the Individual Defendants affirmatively directed their subordinates at the Company (*e.g.*, Chief Commercial Officer Kleine and his account management team) to meet their 1Q 2011 revenue numbers through repapering customer contracts – and to the detriment of generating new business.  Each of the Defendants either knew or recklessly disregarded that this scheme misstated revenue based on the fact that several senior members of the Company's own finance team, including the Director of Revenue Accounting and Vice President of Sales Operations, had expressly objected that the scheme violated GAAP and the Company's stated revenue recognition policies.

128.    Defendants' knowledge or deliberate recklessness is also evidenced by the firing or demotion of those members of senior management who did object to the repapering scheme. In or around January 2011, when Director of Revenue Accounting Wong refused to go along with the scheme, he was quickly replaced in that position by Ndiritu (leading to Wong's departure later in the year).  Also in or around January 2011, when Vice President of Sales Operations Ochoa expressed his objections, he was soon terminated.  Then, within two months

after the scheme had fallen apart in 2Q 2011, and the truth had been disclosed to investors, Chief Accounting Officer Podbere resigned from the Company. All of these terminations of employment among the senior members of the Company's finance team – by firing, demotion, and resignation – raise a strong inference of scienter.

129.     Defendants had substantial motive and opportunity to inflate Epocrates' revenues as each stood to earn substantial additional compensation to the extent the Company met certain performance metrics.   In addition to their six-figure base salaries, Defendants Crane and Spangler were eligible to receive a substantial annual cash bonus equivalent to up to 75% and 60% respectively of their annual salary in 2011 provided the Company achieved corporate objectives with respect to sales bookings, revenue and EBITDA.   Defendants Crane and Spangler were also eligible to receive substantial stock option awards under Epocrates' Equity Incentive Plan – 98,119 shares for Crane and 41,210 shares for Mr. Spangler – in the event these objectives were achieved.

130.     Defendants attempted but were unable to continue the repapering scheme into 2Q 2011.  Had Defendants succeeded in doing so, however, Defendant Crane would have been free to cash out by exercising vested options to purchase nearly 450,000 shares of Epocrates stock at an exercise price of $12.11 per share, and then selling the shares at the prevailing market price before the disclosure of the fraud.   In other words, Defendant Crane would have received windfall profits of over $2 million.   Crane was unable to sell the shares during the Class Period because they were subject to a lock-up agreement entered into in connection with the Company's IPO.   However, that agreement was scheduled to expire on August 26, 2011.

## IX.     LOSS CAUSATION

131.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

132.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and members of the Class. During the Class Period, Plaintiff and Class members purchased Epocrates securities at artificially inflated prices

caused by Defendants' misconduct as alleged herein. The price of the Company's securities declined significantly when the material risks concealed by Defendants materialized and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

133.    Before the end of the Class Period on August 9, 2011, investors had been unaware of the following material facts about Epocrates that had been known to Defendants at the time of the February 1 IPO and throughout the Class Period:

a.    Although DocAlerts were directed to healthcare professionals, and not to consumers, the Company's pharmaceutical customers nonetheless were subjecting sponsored DocAlerts to the same regulatory approval process as other direct-to-consumer ("DTC") marketing activities.

b.    As pharmaceutical companies awaited guidance from the FDA relating to drug advertising on the Internet and in social media, they were increasingly delaying their marketing activities.

c.    Further, as a result of regulatory uncertainty, pharmaceutical companies were subjecting their marketing activities on the Internet and in social media to careful scrutiny during their internal regulatory approval processes.

d.    At the same time, the number of drug promotion programs delivered through the Internet and social media was growing rapidly.

e.    All of these factors resulted in expanding regulatory queues, which was delaying the required approval by the pharmaceutical companies of each DocAlert before it could be released.

f.    The delayed release of DocAlerts negatively impacted the Company's ability to recognize a substantial amount of deferred revenue, a fact that Defendants concealed by engaging in the fraudulent repapering scheme alleged herein.

134.    To conceal these adverse facts, Defendants concocted and executed the fraudulent scheme described in §IV, *supra*, that involved repapering customer contracts to

prematurely recognize DocAlert revenue in 1Q 2011. As alleged in §VII, *supra*, Defendants' improper revenue recognition scheme violated GAAP and the Company's stated accounting policies by improperly and prematurely recognizing DocAlert revenue, which artificially inflated the Company's results in 1Q 2011, and caused Defendants' reports of revenue growth to be similarly false and misleading.

135.   Defendants' misrepresentations and omissions and fraudulent scheme, as alleged in §V, *supra*, misrepresented and concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that the Company's regulatory risk was negligible when, in fact, expanding regulatory queues had negatively impacted revenue and rendered the Company incapable of meeting the market's revenue expectations in 2011.

136.   As alleged in §VI, *supra*, all of these material facts were revealed to investors for the first time on August 9, 2011. For example, during the August 9 conference call, Defendants disclosed the following:

a.      Spangler: "[O]ur second quarter revenues was impacted by the timing of revenue recognition from pharma contracts. Revenue on some of these contracts which we anticipated recognizing in the second quarter was pushed out later into 2011 and 2012."

b.      Crane: "[A]s [pharmaceutical companies] start to move more into the digital space, they have new types of programs to approve. So, unfortunately, we sit in that queue with the other programs. And so, it's just really taking it longer to finally get approved. . . ."

137.   As explained in an analyst report issued by William Blair on August 10, 2011, Defendants' August 9 disclosures revealed that the market had severely misapprehended the Company's regulatory risk:

Previously, we felt that Epocrates would be able to avoid a similar [regulatory] headwind, as the company focuses on direct-to-physician communications versus WebMD's model of both direct-to-physician and direct-to-consumer advertising. . . . Unfortunately, it appears that expansion of medical/legal reviews at pharma

partners is simply lengthening the approval queue for all advertising and promotion vendors—even those, like Epocrates, that are not seeing any challenges to their service offerings.

138. When this new information came to light, the market was caught entirely by surprise, and certain analysts noted the gap between the market's perception and the concealed reality. For example, the August 10 William Blair report pointedly noted that: "Epocrates management indicated that it was seeing no such [regulatory] headwinds emerge on its May 10, 2011, earnings call, indicating (in response to a question) that, 'we aren't seeing that trend. It's been a very strong, steady growth in what we're doing with pharma in the digital space.'"

139. Defendants' disclosure of 2Q 2011 revenue that failed to meet the market's consensus expectations was the materialization of the previously concealed risk to revenue growth from expanding regulatory queues that had been concealed by Defendants' material misrepresentations and omissions and fraudulent scheme to prematurely recognize revenue. To make up for the DocAlert revenue shortfall caused by expanding regulatory queues, Defendants accelerated revenue into 1Q 2011 by cancelling contracts for which revenue could not be recognized either because (i) DocAlerts were bundled with indivisible services that had not been completed (*e.g.*, EssentialPoints), or (ii) DocAlerts were stuck in the regulatory queue and could not be delivered. Thus, Defendants falsely reported the Company's revenue growth over prior periods. The disappointing revenue growth in 2Q 2011 was the direct result of: (i) the Company's inability to timely deliver contracted DocAlerts due to expanding regulatory queues, and (ii) Defendants' inability to continue the repapering scheme in subsequent quarters as bookings slowed in 2011.

140. As alleged in §IV.D, *supra*, CW1 explained it was not feasible to continue the repapering scheme because bookings were down in 2011. CW2 likewise explained that the Company could not meet 2Q 2011 revenue expectations because there were not enough customer contracts that could be repapered. For this reason, the scheme could no longer continue, and the Company could no longer artificially postpone revealing its revenue slowdown. The Company's disappointing 2Q 2011 revenue numbers were the materialization

of the risk to revenue growth from expanding regulatory queues that had been concealed by Defendants' fraud.

141. In reaction to Defendants' August 9 disclosures, during the next trading day on August 10, 2011, the market drove down the value of Epocrates' shares, wiping out 41% of its total market capitalization. On that day, the price of the Company's common stock plummeted from $16.69 to a closing price of $9.89, a drop of $6.80 on unusually heavy trading volume.

## X. CLASS ACTION ALLEGATIONS

142. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the securities of Epocrates during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

143. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Epocrates securities were actively traded on the NASDAQ Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Epocrates shares were traded publicly during the Class Period on the NASDAQ. As of July 31, 2011, the Company had 23,530,255 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Epocrates or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

144. Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws that is

complained of herein. Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

145.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' conduct alleged herein;

        b.    whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of Epocrates; and

        c.    to what extent Class members have sustained damages and the proper measure of damages.

146.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

147.    The market for Epocrates securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's securities traded at artificially inflated prices during the Class Period. On February 4, 2011, the Company's stock closed at a Class Period high of $26.51 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying on the integrity of the market price of such securities and on publicly available

market information relating to Epocrates; Plaintiff and Class members have been damaged thereby.

148.    During the Class Period, the artificial inflation of the value of Epocrates securities was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiff and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's securities to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's securities, causing Plaintiff and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

149.    At all relevant times, the market for Epocrates securities was efficient for the following reasons, among others:

a.      Epocrates' stock met the requirements for listing, and it was listed and actively traded on the NASDAQ, a highly efficient and automated market.

b.      As a regulated issuer, Epocrates filed periodic public reports with the SEC and/or the NASDAQ.

c.      Epocrates regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

d.      Epocrates was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

150.    Based on the foregoing, during the Class Period, the market for Epocrates securities promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of Epocrates stock. Under these circumstances, the market for Epocrates securities was efficient during the Class Period and, therefore, investors' purchases of Epocrates securities at artificially inflated market prices give rise to a class-wide presumption of reliance under the fraud-on-the-market doctrine.

151.    In the alternative, the Affiliated Ute presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts that concealed the expanding regulatory queues for DocAlerts and the resulting negative impact on the Company's revenue.

## XII.   NO SAFE HARBOR

152.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## XIII.   COUNTS

### FIRST COUNT
### Violation of §10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder Against All Defendants

153.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against all Defendants.

154.     During the Class Period, Defendants: (i) knowingly or with deliberate recklessness deceived the investing public, including Plaintiff and Class members, as alleged herein; (ii) artificially inflated the market price of Epocrates securities; and (iii) caused Plaintiff and Class members to purchase or otherwise acquire Epocrates securities at artificially inflated prices.

155.     Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading, which operated as a fraud and deceit upon Plaintiff and the Class, in an effort to create or maintain an artificially inflated price of Epocrates securities during the Class Period. Defendants' material misrepresentations and omissions are alleged in §V, *supra*.

156.     As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

157.     As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

158.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, made or substantially participated in the creation and/or dissemination of false or misleading statements of material

fact as set forth herein, or with deliberate recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them. Defendants carried out a deliberate scheme to misrepresent and conceal the Company's revenue, trends having a material impact on its revenue, and its regulatory risks.

159.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew or with deliberate recklessness disregarded that the Class Period statements set forth in §V, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

160.    By virtue of the Individual Defendants' positions of management and control within Epocrates, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with each other and corporate officers and employees; attendance at sales, management, and Board of Directors' meetings, including committees thereof; and reports and other information provided to them in connection with their roles and duties as Epocrates officers and/or directors.

161.    The Individual Defendants were aware of or with deliberate recklessness disregarded that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements, in violation of the federal securities laws.

162.    As a result of Defendants' dissemination of the materially false or misleading information and their failure to disclose material facts, as alleged herein, the market price of Epocrates securities was artificially inflated throughout the Class Period. Unaware that the market price of Epocrates securities was artificially inflated; relying directly or indirectly on the false or misleading statements made by Defendants at the times such statements were made, or relying upon the integrity of the markets in which Epocrates securities traded; and in the absence of material adverse information that was known, or with deliberate recklessness

disregarded, by Defendants but not disclosed to the public, Plaintiff and Class members purchased or otherwise acquired Epocrates securities at artificially inflated prices.

163.    Had Plaintiff and the other Class members known the truth regarding the problems that Epocrates was experiencing, which was not disclosed by Defendants, Plaintiff and other Class members would not have purchased or otherwise acquired Epocrates securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

164.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases and sales of Epocrates securities during the Class Period, when the artificial inflation in the price of such securities dissipated as the truth regarding Defendants' conduct was revealed, causing the price of Epocrates securities to decline, resulting in economic losses to Plaintiff and the Class.

165.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, and they are liable to Plaintiff and the Class for damages suffered in connection with their transactions in Epocrates securities during the Class Period.

**SECOND COUNT**
**Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

166.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. This claim is asserted against the Individual Defendants.

167.    Epocrates is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

168.    The Individual Defendants acted as controlling persons of Epocrates within the meaning of §20(a) of the Exchange Act. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence, and during the Class Period did

exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein. The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls. The Individual Defendants controlled Epocrates and each of its employees.

169.   The Individual Defendants were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to contain material misrepresentations and omissions prior to or shortly after their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the Company's public reports and releases.

170.   By virtue of their positions as controlling persons of Epocrates, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

1       (d)     Such other and further relief as the Court may deem just and proper.

2 **XV.   JURY TRIAL DEMANDED**

3      Plaintiff hereby demands a trial by jury.

4 Dated: October 23, 2014          **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

5

6          By:  *s/Beth A. Kaswan*
         Beth A. Kaswan

7          Deborah Clark-Weintraub
         Donald A. Broggi

8          Amanda F. Lawrence
         Joseph D. Cohen

9          The Chrysler Building
         405 Lexington Avenue. 40th Floor

10          New York, New York 10174
         Telephone: (212) 223-6444

11          Facsimile: (212) 223-6334
         Email: bkaswan@scott-scott.com

12              dweintraub@scott-scott.com
             dbroggi@scott-scott.com

13              alawrence@scott-scott.com
             jcohen@scott-scott.com

14

15          **DAVID R. SCOTT**
         156 South Main Street, P.O. Box 192

16          Colchester, Connecticut 06415
         Telephone: (860) 537-5537

17          Facsimile: (860) 537-4432
         Email: david.scott@scott-scott.com

18          **GLANCY BINKOW & GOLDBERG LLP**

19          Lionel Z. Glancy
         Michael Goldberg

20          Robert V. Prongay
         Joshua L. Crowell (#295411)

21          Casey E. Sadler
         1925 Century Park East, Suite 2100

22          Los Angeles, California 90067
         Telephone: (310) 201-9150

23          Facsimile: (310) 201-9160
         Email: info@glancylaw.com

24

25          *Attorneys for Lead Plaintiff and the Class*

26

27

28

**PROOF OF SERVICE**

     I hereby certify that on October 23, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

*s/Beth A. Kaswan*
Beth A. Kaswan
The Chrysler Building
405 Lexington Avenue. 40th Floor
New York, New York 10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
Email: bkaswan@scott-scott.com