UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT,<br><br>Plaintiff,<br><br>v.<br><br>ROSEMARY A. CRANE, et al.,<br><br>Defendants. | Case No. 13-cv-00945-VC<br><br>**ORDER DENYING MOTION TO DISMISS**<br><br>Re: Dkt. No. 82 |

**I**

In this securities fraud case, the plaintiff alleges that Epocrates, Inc. and its executives defrauded the investing public by failing to disclose that the company had systematically restructured contracts with its customers for the purpose of accelerating revenue recognition in Q1 2011, in response to a discovery that revenue for this quarter would otherwise be much lower than expected. Epocrates and its executives have moved to dismiss the third amended complaint. The motion is denied because the complaint alleges with enough particularity that the defendants intended to deceive investors by favorably comparing the company's Q1 2011 revenue numbers to its Q1 2010 revenue numbers, without disclosing a significant change (namely, the contract restructuring) that made the comparison misleading.

**II**

The third amended complaint contains the following allegations, which the Court must assume are true for purposes of this motion only.

During the pertinent period Epocrates offered an application ("app") for smart phones and tablets to be used by doctors and other health professionals. The app helped health professionals treat patients by giving them information about pharmaceutical products. For example, doctors

could receive information about dosage, interactions, price, and insurance coverage for thousands of drugs.

One way Epocrates made money was by charging pharmaceutical companies for the right to communicate with Epocrates' subscribers through the app. The company's flagship product was called the DocAlert – a short message that Epocrates would disseminate to its subscribing health professionals. Roughly 30% of the DocAlerts were promotional messages sponsored by pharmaceutical companies. Epocrates would enter into contracts with pharmaceutical companies to disseminate a specified number of DocAlerts on their behalf over a set period of time. It was not uncommon for a contract with a pharmaceutical company to call for the dissemination of four DocAlerts over the course of a year.

Pharmaceutical companies were concerned that federal regulators would scrutinize their communications with health professionals. For this reason, each pharmaceutical customer had its own internal regulatory team that reviewed and approved all sponsored DocAlerts before dissemination by Epocrates. By the end of 2010, Epocrates began to see delays in the internal regulatory approval of DocAlerts by the pharmaceutical companies.

The pharmaceutical companies typically paid Epocrates up-front for the future dissemination of DocAlerts. From an accounting standpoint, Epocrates would assign a portion of the contractual payment to each DocAlert. The amount assigned to a particular DocAlert would be treated as deferred revenue, not to be recognized until Epocrates actually disseminated the DocAlert to the health professionals. But the contracts also typically contained "use-it-or-lose-it" provisions. That is, if the contract term expired and the pharmaceutical company had not yet approved a DocAlert for dissemination, Epocrates could keep the money while being freed of the obligation to deliver the DocAlert.

Epocrates had an initial public offering ("IPO") on February 1, 2011. The complaint alleges that the company handled the use-it-or-lose it provisions of its DocAlert contracts differently before and after the IPO. Before the IPO, the common practice was to extend the contracts to give pharmaceutical customers time to approve the DocAlerts. According to one confidential witness who was a Senior Vice President of Sales throughout the relevant period and

2

who the plaintiffs label as CW5, "when there were delays by pharmaceutical customers in producing the DocAlerts, it was his practice and the practice of his sales teams to extend their Pharma customers' contracts so that they would receive full value for their payments." TAC ¶ 54. And CW3, who was Vice President of Sales Operations and Business Systems until two months after the IPO, "confirmed that, pre-IPO, the Epocrates' sales force regularly granted extensions of the contract period to its large pharmaceutical clients." TAC ¶ 55.

But as Epocrates was preparing to launch its IPO, CW1, who was the Senior Manager of Financial Planning and was responsible for preparing internal financial forecasts, discovered a problem, which caused the company to change the way it handled the use-it-or-lose it provisions. CW1 projected that Epocrates was not going to meet its internal revenue goal for Q1 2011, and that there was a "big hole" between the company's goal and his latest revenue projection. The reason was the increasing delays in approval of DocAlerts by the pharmaceutical companies. Because of these delays, Epocrates would be unable to disseminate as many DocAlerts in Q1 2011 as it had been assuming. And therefore Epocrates would be unable to recognize as much revenue in that quarter as it had projected.

CW1 brought this to the attention of senior management, which resulted in a meeting of the company's high-level executives. The meeting included CEO Rosemary Crane and CFO Patrick Spangler – the two officers who are named as individual defendants in this case. The meeting took place in January, before the IPO. During the meeting, the attendees decided they needed to narrow the gap between the company's prior first quarter revenue forecast and CW1's updated forecast. CW3 confirmed that a January 2011 meeting occurred at which the revenue shortfall was discussed. It is not clear from the complaint whether this was the same meeting as the one described by CW1.

Then, after the February 1st IPO, senior executives met every day to discuss the revenue shortfall and to implement a "repapering scheme" to close the gap. The scheme involved the premature cancellation of contracts with pharmaceutical companies for the dissemination of unused DocAlerts for which Epocrates had already been paid, but for which revenue recognition had been deferred. The cancellations allowed Epocrates to immediately recognize the revenue

3

from those DocAlerts because of the "use-it-or-lose-it" provisions in the contracts. Crane and Spangler attended these daily meetings and provided direction for the project. At the meetings, the attendees scrutinized each DocAlert contract to identify opportunities to immediately recognize revenue to address the shortfall.

In exchange for the pharmaceutical companies' agreement to prematurely cancel the contracts, Epocrates entered into new contracts with those same companies. The complaint alleges the following about the new contractual arrangements:

- "As CW1 explained: 'If there was a deal that we could not recognize, we would have the customer cancel and negotiate a new contract' that would allow the Company to recognize additional revenue in 1Q 2011 while effectively offering free or discounted future products to maintain its customer base." TAC ¶ 33.
- "To preserve their business relationships, Defendants then compensated customers for the forfeiture of their deposits by providing future discounts, additional DocAlerts or other services in the replacement contracts. In this manner, Defendants swapped out the unused obligations to deliver DocAlerts in the old contracts for future obligations . . . ." ¶ 29.
- "CW1 added that to get a pharmaceutical customer to repaper a contract, the Company had to ensure the customer was 'made whole' by providing future discounts or supplemental services." ¶ 33.
- "CW2 stated that to incentivize customers to agree to repaper their contracts, they were, at times, given discounts that were applied to the new contracts." ¶ 36.
- "According to CW2, services that had not been delivered under the old contract were exchanged for something else under the new contract. . . . CW2 provided examples of the incentives, including more DocAlerts, and instances when unused DocAlerts were exchanged for surveys." ¶ 36.
- "CW7, a Regional Vice President and Sales Director from 2008 to late 2011, confirmed that he had to offer incentives – for example, trading three unused DocAlerts in the existing contract for four in the new contract (thus offering

4

effectively a 'free' alert) – in order to convince his customers to renegotiate." ¶ 37.

As discussed in Section III, these allegations leave questions about how the "repapering" actually worked. But in any event, according to the complaint, some people at Epocrates objected to it, and suffered retaliation for their objections. CW1 stated that during the daily "revenue meetings" the senior financial management team told Crane and Spangler that repapering contracts was "improper." TAC ¶ 61. CW2, a Senior Revenue Accounting Manager, stated it was one of the reasons she left the company in May 2011. CW2 also reported that before the IPO, Rene Ochoa, the Vice President of Sales Operations, had an email exchange with Chief Accounting Officer Burt Podbere, in which Ochoa asserted that the practice of using renegotiated DocAlert contracts to manipulate revenue recognition was "unethical." TAC ¶ 62. Crane and Spangler were copied on this exchange. CW2 stated that Ochoa was "subsequently terminated." TAC ¶ 62. CW3 also protested the repapering scheme, sending an email in January 2011 to Podbere and Spangler (among others) stating that it was "inconsistent with the Company's stated accounting policies and with GAAP." TAC at ¶ 64. Two months later, Epocrates "terminated" CW3. TAC ¶ 64.

In announcing the company's financial results for Q1 2011 (and comparing them to results from Q1 2010) the defendants made a number of statements about Epocrates' overall performance, its revenues, and its DocAlert business in particular:

- In a May 2011 conference call with analysts, Spangler stated: "Interactive service revenue was approximately $23.0 million for Q1 of 2011, representing a 23.6% growth compared to Q1 of 2010. This increase was driven by DocAlert line extensions and the ongoing launch of our Virtual Rep Services." TAC ¶ 91.
- During the same May 2011 conference call, Spangler announced: "As reported in our last call, total backlog was $86.5 million at the end of 2011, which provides approximately 60% visibility in the forecasted 2011 revenue with the balance to be generated through new bookings throughout the course of 2011." ¶ 92.
- In the same May 2011 conference call, a William Blair & Co. analyst asked: "[Y]our pharma bookings were very strong during the quarter, showing good

momentum. One of your competitors last week indicated that they're seeing a little more hesitation actually on the pharma side to move toward digital media, given some of the large [fines] in the corporate integrity agreements, and I'm curious if you've seen that at all. It's obviously not reflected in your bookings, but any of your customers getting a little more cautious on some of the novel programs given those [CIAs]?" And Crane answered: "Actually, we aren't seeing that trend. It's been a very strong, steady growth in what we're doing with pharma in the digital space." ¶ 93 (brackets in original).

- In its Form 10-Q, Epocrates reported: "[There] have been no significant changes in our critical accounting policies during the quarter ended March 31, 2011 compared to those previously disclosed in Critical Accounting Policies and Estimates in Management's Discussion and Analysis of Financial Condition and Results of Operations included in our Annual Report on Form 10-K." ¶ 87.

- In its press release for the Q1 2011 results, Epocrates reported: "Our overall net sales growth was driven by a strong performance across both our subscription and interactive services businesses, which grew approximately 8% and 24%, respectively, versus the prior year quarter. Notably, sales in our core pharmaceutical business, which include DocAlert messages and virtual representative services, increased by over 40% during the first quarter of 2011 compared to the same quarter of the prior year. These results reflect the growth in bookings that we saw in 2010 and the positive momentum we have generated from the investments we made to expand our product pipeline." ¶ 90.

Epocrates regularly published a disclosure about the timing of revenue recognition from contracts. The disclosure stated that the time between the effective date of a contract and the revenue recognition associated with the contract "may be lengthy, especially for larger contracts with multiple deliverables, and may be subject to delays over which we have little or no control, including those that result from the client's need for internal approvals." TAC ¶ 72. But the defendants did not disclose that they canceled numerous DocAlert contracts, nor did they disclose

6

that this was a change from prior quarters in the way they handled the use-it-or-lose it provisions.

After Q1 2011, the problem with delays in DocAlert approvals continued, and there were no longer enough contracts to be "repapered." Accordingly, in August 2011, when Epocrates announced its second quarter results, the market was disappointed. Revenue from interactive services, including DocAlerts, grew slower than analysts had expected. In a press release, Crane identified two factors "which are impacting the timing of revenue growth." TAC ¶ 101. The first was that "[d]ue to expanding regulatory queues," the company was "experiencing delays in the launch of DocAlert messages." TAC ¶ 101. The second was that, for the company's "newer products," delay in revenue recognition was "longer than expected due to the size and complexity of these launches." TAC ¶ 101. Crane concluded that these factors had impacted second quarter revenue and were "expected to continue to affect the timing of our net sales for the remainder of the year." TAC ¶ 101. The next trading day, Epocrates stock dropped 41%, from $16.69 per share to $9.89 per share. The plaintiff, Police and Fire Retirement System of the City of Detroit, purchased Epocrates stock after the IPO but before the disappointing earnings announcement, suffering financial harm as a result.

## III

The plaintiff claims the defendants materially misrepresented Epocrates' financial condition in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5, which interprets and implements that statute. To prevail, the plaintiff must plead with specificity: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1317 (2011). The complaint is subject to a heightened pleading standard, which requires a plaintiff to "state with particularity the circumstances constituting fraud" and to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2)(A) (PSLRA); *see In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

Primarily at issue are whether the complaint successfully pleads that the defendants

materially misrepresented Epocrates' financial condition to investors, and whether the complaint successfully pleads scienter, i.e., that the defendants acted with the required intent.

**A. Materiality**

To satisfy the materiality requirement, the plaintiff must allege and later prove that the defendants made a statement (or an omission) that was "misleading" as to a "material" fact. *Matrixx*, 131 S.Ct. at 1318. "For a misrepresentation to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Todd*, 642 F.3d 1207, 1215 (9th Cir. 2011) (citation and internal quotation marks omitted).

The first question, therefore, is whether it was "material" that the defendants convinced many of their pharmaceutical customers to prematurely cancel DocAlert contracts, for the acknowledged purpose of closing the gap between Epocrates' actual and desired revenue projections for Q1 2011. Reasonable investors would obviously have wanted to know that. According to the allegations in the complaint, the repapering scheme allowed Epocrates to significantly prop up its sagging revenue numbers and report significant quarterly growth from the prior year. "Information regarding a company's financial condition is material to investment," and "how officers and directors of a public corporation describe revenue growth to investors is important." *Todd*, 642 F.3d at 1221.

The next question is whether the complaint successfully alleges the defendants misled investors on this material issue. It does. To be sure, companies are not required to disclose all material information. "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose . . . by controlling what they say to the market." *Matrixx*, 131 S.Ct. at 1322. But a duty to disclose arises if the company has made other statements to the public that would be misleading absent disclosure of the omitted information. *Id.* at 1321. Here, the defendants compared their revenue numbers from Q1 2011 to those from Q1 2010, and passed this off as an apples-to-apples comparison. But it was not a fair comparison, because the company's 2011 numbers were, according to the complaint, the product of a significant change. Epocrates previously had a practice of extending the life of DocAlert

8

contracts, thereby deferring revenue recognition beyond the life of those contracts. But in Q1 2011, it switched to a practice of shortening the life of DocAlert contracts, thereby accelerating revenue recognition. The quality of the company's announced earnings in Q1 2010 was therefore very different from the quality of its announced earnings in Q1 2011.

In this respect, the "repapering scheme" is similar to the "AOL transaction" in *Todd*, which the Ninth Circuit described as follows:

> Prior to the change, AOL agreed to pay a fee to Gateway whenever a buyer of a Gateway computer registered with AOL. Under the modified agreement, fees were payable as soon as a Gateway computer was shipped to a customer, permitting Gateway to book revenue upon shipment.

642 F.3d at 1214. This change was material, the Ninth Circuit explained, because it was "atypical" and because "the revenue gap would not have been closed" without it. *Id.* at 1221. And Gateway misled the investing public by failing to disclose the change, because Gateway had told investors that revenue growth was "accelerating" over prior quarters. Here, if Epocrates had disclosed revenue numbers for Q1 2011 that were based on the prior practice of extending the life of contracts (thereby further deferring revenue recognition), those numbers would have been much lower, and the comparison to the first quarter of the prior year would have been much different.[1]

The defendants contend they were not obligated to disclose the "repapering scheme" because it was a change in "internal" customer relations practices, not accounting practices. But there's no rule that a company need only disclose material information directly related to

---

[1] Other statements may well have been misleading for similar reasons. For example, the company boasted that "sales in our core pharmaceutical business, which include DocAlert messages and virtual representative services, increased by over 40% during the first quarter of 2011 compared to the same quarter of the prior year." TAC ¶ 90. But the company was reporting year-over-year sales growth without disclosing its change in practice, which may have artificially inflated sales. Statements touting the strength of the DocAlert business, including statements about the company's backlog and visibility into future quarters' revenue, may also have been misleading because Epocrates did not disclose the difficulty it was experiencing in recognizing revenue from those contracts. *See, e.g.,* TAC ¶¶ 91, 92. Because investors were unaware that there were serious delays in delivering DocAlerts, they were unable to accurately assess the value of the deferred revenue backlog and whether this backlog was likely to be recognizable any time soon. Although Epocrates disclosed a risk of delays, it did not reveal that the delays were already occurring. *See, e.g.,* TAC ¶ 88, Ex. C at 37 (Revenue recognition "may be subject to delays . . . including those that result from the client's need for internal approvals."). But it's not necessary at this stage to decide which of the defendants' many statements were false or misleading, because at a minimum their statements about year-over-year revenue growth were misleading.

accounting practices. The rule is that a company must disclose material information (regardless of how one characterizes it) if the failure to disclose would leave the public with a misimpression about the health of the company. This is exemplified by the Supreme Court's recent decision in *Matrixx*, which held that the plaintiff successfully alleged a material misrepresentation where the company had failed to disclose the possibility that its cold medicine was causing people to lose their sense of smell (while suggesting publicly that this was not the case). *Matrixx*, 131 S.Ct. at 1323.

The defendants also contend they didn't need to disclose the new practice of prematurely canceling contracts because they had never publicized the prior practice of extending contracts for pharmaceutical clients. But that's not the point. Epocrates may not have been required to disclose in 2010 that it been giving pharmaceutical customers a break on the use-it-or-lose-it provisions, but once it changed this practice, it was obligated to disclose that the comparison between the earlier and later revenue figures was not apples-to-apples. Indeed, even if Epocrates had not previously given customers extensions on their contracts (instead simply enforcing the use-it-or-lose-it provisions when the contracts expired), the switch to systematic cancellation of contracts (for the very purpose of improving the company's Q1 2011 revenue numbers) was material and required disclosure. After all, Epocrates did tell the public that it recognized revenue once DocAlerts were disseminated, which was no longer accurate in Q1 2011, because it was recognizing revenue even when DocAlerts weren't disseminated (and before the contracts had run their course).

A final point on the issue of materiality: there is nothing inherently wrong with restructuring contracts. The plaintiff spends a great deal of energy arguing that the "repapering scheme" was itself illegal or unethical, but this is a distraction. For one thing, the allegations in the complaint are not specific enough to allow the reader to determine whether the "repapering" was improper. In particular, the complaint doesn't describe, in any understandable fashion, the contracts Epocrates entered into with its pharmaceutical clients to replace the contracts it

prematurely canceled.[2] But more importantly, it doesn't matter whether the repapering scheme was proper or improper. What matters is that the defendants misled investors by concealing the change. In *Todd*, the AOL transaction "itself was not improper," 642 F.3d at 1214, but Gateway materially misled investors by failing to disclose it while asserting that the company was experiencing accelerated revenue growth. Here, even if the restructuring was permissible, the complaint successfully alleges that Epocrates materially misled investors by failing to disclose the restructuring while asserting that revenue grew 23.6% over the same quarter of the prior year.

**B. Scienter**

To plead scienter, a complaint must "allege that the defendant[] made false or misleading statements either intentionally or with deliberate recklessness." *Id.* (quotation omitted). As the Ninth Circuit has explained:

> In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd., et al.*, 551 U.S. 308, 323, 127 S.Ct. 2499 (2007). Thus, "[t]he strength of an inference cannot be decided in a vacuum" and "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.*

---

[2] Take, for example, Paragraph 37, which is the most specific example the complaint gives of Epocrates and a pharmaceutical client swapping out an old contract for a new one. Paragraph 37 states in full: "CW7, a Regional Vice President and Sales Director from 2008 to late 2011, confirmed that he had to offer incentives – for example, trading three unused DocAlerts in the existing contract for four in the new contract (thus offering effectively a 'free alert') – in order to convince his customers to renegotiate." Two inferences could be drawn from this allegation. On the one hand, perhaps Epocrates convinced its client to cancel the contract by agreeing to move those three unused DocAlerts into a new contract at no extra cost, and also agreeing to add a fourth for free. On that inference, Epocrates effectively gave away four new DocAlerts, and stood to gain no new revenue. On the other hand, perhaps Epocrates convinced its client that, because the client faced a situation where it still had three unused DocAlerts stuck in the regulatory queue on a contract that was about to expire, the client should cut its losses on that contract and enter into a new one in which it would receive four DocAlerts for the price of three. In other words, Epocrates might have informed its client that it would not give an extension on the current contract (because a deal's a deal) but to maintain good relations the client would get a discount (a 'free alert') if it bought three more DocAlerts. On that inference, the client is paying Epocrates for six out of the seven DocAlerts referenced in Paragraph 37, whereas under the old contract it would only have been paying for three. And in that scenario, Epocrates gets the dual benefit of immediately recognizing revenue on the three DocAlerts in the soon-to-expire contract and putting three more DocAlerts in the pipeline, for which it will be able to recognize revenue in future quarters. Unfortunately, at oral argument, counsel for the plaintiff stated she did not know how the replacement contract in Paragraph 37 actually worked, nor was she able to resolve the many ambiguities in the third amended complaint about how any of the other replacement contracts worked.

> at 323–24. Under the proper analysis, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* at 324 (emphasis added).

*In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d at 701.

On the facts alleged, the more compelling inference is that the defendants intended to mislead the public when they reported revenue growth and touted the strength of the DocAlert business without disclosing that they had systematically canceled contracts for the purpose of accelerating revenue recognition and closing the gap between actual and desired revenue projections. To recap, Crane and Spangler learned of the gap in January, and they were told it was significant. They promptly began holding daily meetings for the purpose of finding ways to prop up the company's first quarter revenue numbers. They did this by going through the company's pharmaceutical contracts at the meetings and identifying which ones they could cancel. The company then systematically canceled pharmaceutical contracts and replaced them with new contracts, so that they could recognize the revenue from the canceled contracts that would otherwise continue to be deferred. Several people in the company protested this practice, including directly to Crane and Spangler. In particular, one person complained the practice was unethical, and another complained that it violated GAAP. Some of those people were subsequently demoted or terminated. Given the allegations of detailed involvement by Crane and Spangler and given the importance that the complaint alleges they attached to the problem, the strongest inference is that the defendants intended to mislead the public by not disclosing it.

Indeed, the facts alleged in this case create a more compelling inference of scienter than in *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), where the Ninth Circuit held that a securities fraud complaint must go forward. There, the plaintiffs alleged "no particular facts" indicating that the company's high-level managers knew of a revenue problem, but the court concluded such knowledge could be inferred because the managers "were directly responsible" for the company's "day-to-day operations," making it "hard to believe that they would not have known" about the problem. *Id.* at 987-88. Here, the complaint does allege specific facts indicating that Crane and Spangler knew about the problem and knew that it was a serious one. It alleges they participated in daily meetings whose purpose was to rectify the problem, and that they

were the ones who directed the "repapering" scheme. Many people protested the scheme, and whether the protesters were right or wrong, the protests underscore the importance of the issue. Even more than in *Berson*, it readily follows from the allegations about the defendants' knowledge of the problem that they intended to mislead the investing public, because the problem was so obvious and the decision to conceal it so significant. *Cf. Todd*, 642 F.3d at 1222 ("The record suggests that Weitzen knew that the Lockheed and AOL transactions were unusual, one-time events used to meet the quarterly revenue targets. The record further demonstrates that Weitzen understood that without the Lockheed and AOL transactions, Gateway would not meet the analysts' quarterly expectations. This is sufficient to create an issue of fact as to whether Weitzen at least acted recklessly (and thus with scienter) when he claimed that Gateway's financial growth was 'accelerated.'").

The defendants' arguments for why the complaint fails to allege scienter might carry the day under a different factual scenario, but not under the scenario discussed above. For example, the defendants note that the complaint's allegations don't make clear that Crane and Spangler were aware that delays in DocAlert approvals would continue in future quarters. Doc. No. 39. But that is not relevant to whether the defendants withheld information that they knew investors would need to fully assess the quality of Epocrates' first quarter earnings, which is at least as relevant to the decision whether to buy (or sell) stock in the company. The defendants also note that irregular insider sales can bolster an allegation of intent to defraud by showing motive, and they correctly note that there is no indication of a financial motive here beyond what an executive typically has during an IPO. But irregular trading by insiders is not necessary to create a strong inference of scienter, *Matrixx*, 131 S.Ct. at 1324, and in particular it is not necessary in cases like *Berson*, *Todd*, and this one, where the complaint adequately alleges that high-level executives had detailed knowledge of a serious problem that obviously needed to be disclosed.

**C. The Defendants' Other Arguments**

The defendants argue the complaint fails to allege loss causation. A plaintiff may plead loss causation by alleging that "the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Nuveen Mun. High Income Opp. Fund*

13

United States District Court
Northern District of California

*v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quotations omitted). Here, the complaint states that Epocrates missed projected earnings for Q2 2011 because of delays in its ability to deliver and recognize revenue from DocAlerts, and that the stock price dropped significantly following the defendants' announcement of the delays. The plaintiff's loss was therefore directly related to the facts the defendants omitted the prior quarter. This is sufficient to plead loss causation.

Finally, the defendants seek dismissal of the plaintiff's Section 20(a) claim for failure to plead a primary violation of securities law, but because the Section 10(b) claim survives, the Section 20(a) claim survives as well.

## IV

The motion to dismiss is denied. A telephonic case management conference is scheduled for April 7, 2015, and the parties must file a joint case management statement seven days before the conference.

**IT IS SO ORDERED**.

Dated: March 13, 2015

_____
VINCE CHHABRIA
United States District Judge